[No. B051869. Second Dist., Div. Seven. Dec. 24, 1991.]

MEREDITH MILLER, Plaintiff and Appellant, v.
LAKESIDE VILLAGE CONDOMINIUM ASSOCIATION, INC.,
Defendant and Respondent.

COUNSEL

Lindenbaum & Young and Robert J. Young for Plaintiff and Appellant.

Wilner, Klein & Siegel, Leonard Siegel, Laura J. Snoke and Terri L. Einbund for Defendant and Respondent.

OPINION

LILLIE, P. J.—Plaintiff Meredith Miller appeals from summary judgment granted in favor of defendant Lakeside Village Condominium Association, Inc. (Lakeside Village) on plaintiff's fourth amended complaint for damages for personal injuries allegedly caused by defendant's negligence in failing to repair and maintain the plumbing system in plaintiff's condominium.[1] The primary question on appeal is whether the trial court properly concluded that

---

[1]The fourth amended complaint contained three causes of action, purportedly asserted by both plaintiff and her husband, Lee Miller, not a party to this appeal. Only the first cause of action, for property damages for breach of contract, and the third cause of action, for damages for personal injuries, are asserted against Lakeside Village. Lakeside Village moved for summary judgment on the first cause of action on the ground that Meredith Miller was neither an owner of the condominium, owned by her husband as his separate property, nor a party to the contract sued upon, and had no breach of contract claim against it.

In the trial court, plaintiff did not challenge the grant of summary judgment as to the first cause of action, but only opposed the motion for summary judgment on the third cause of

there was no triable issue of material fact on the statute of limitations defense and that as a matter of law defendant was entitled to judgment.

PROCEDURAL AND FACTUAL BACKGROUND

Miller filed her action on August 27, 1986. The gravamen of the fourth amended complaint is the claim that defendant's failure to maintain and repair the plumbing in plaintiff's condominium caused the premises to become mold-infested and caused plaintiff to suffer from a fungal infection, which condition was diagnosed in December 1986 as immune dysregulation.

According to the allegations of the verified fourth amended complaint, the facts in the parties' separate statements which the parties agree are undisputed, and other testimony which is not disputed, plaintiff moved into her future husband's condominium unit in January 1983; the unit and adjacent hallway were flooded several times from mid-1981 through February 1983, and flooded again in February 1983; plaintiff's husband notified defendant of the flooding in February 1983; in September 1983, plaintiff began experiencing allergies and asthma. Plaintiff had no history of asthma. Aside from prior episodes of mild seasonal hay fever which she experienced "back east" and for which she took no medication, plaintiff had no allergies before October 1983.

In September and October 1983, an allergist, Dr. Epstein, tested plaintiff and determined that she was highly allergic to all types of pollens and numerous other substances, including mold. Dr. Epstein advised her that the sudden onset of such allergic reactions was not unusual, but rather, it was common to develop allergies to an environment after having lived there for a substantial number of years. In October 1983, plaintiff noticed that after taking her asthma medication, her heart started beating very fast; she told Dr. Epstein about her rapid heartbeat; when she developed more and more symptoms with her heart, he referred her to Dr. Rubins.

In May through June of 1984, plaintiff was writing her master's thesis and spent most if not all of her time in the unit; she experienced further and more

---

action. Accordingly, only the third cause of action is at issue on this appeal and we deem any issue pertaining to the first cause of action to be abandoned. We do not set out any facts pertinent only to the first cause of action.

Further, respondent points out that a day before the hearing on its motion for summary judgment, and in response to a demurrer by another defendant, plaintiffs filed a fifth amended complaint, which contained identical allegations against Lakeside Village as in the fourth amended complaint. As the trial court honored a purported stipulation that Lakeside Village's motion for summary judgment would be deemed to be addressed to the fifth amended complaint, we also deem the motion to be addressed to the fifth amended complaint. Accordingly, any reference herein to the fourth amended complaint is deemed to include the fifth amended complaint.

severe bouts of asthma. In July 1984, for her worsening condition, she was hospitalized at Cedars Sinai Hospital; she was diagnosed as suffering from allergies, asthma, and an episode of mitral valve prolapse, a heart condition that she had had all her life.

In July and August 1984, plaintiff noticed that the unit smelled musty; Dr. Epstein advised her to have the unit tested for mold contamination; in August, Health Science Associates tested the unit for mold and told plaintiff that they found more mold in her unit than they had found previously in any residence; although the location of the mold was not determined, plaintiff told Dr. Epstein of the results of the mold contamination testing in early September 1984; he advised plaintiff to leave the unit. According to plaintiff's declaration submitted in opposition to the summary judgment motion, Dr. Epstein did not tell her that the mold was the cause of her allergies or asthma; plaintiff admits, however, that the doctor told her that the mold was "probably causing a temporary worsening of my general allergic symptoms."

On Labor Day weekend in 1984, plaintiff and her husband relocated to a hotel; plaintiff's allergies did not subside while she was living at the hotel.

In October 1984, the Millers retained a microbiologist, Dr. Swatek, who located the source of the mold infestation behind the panelling on the walls and under the carpeting; Dr. Swatek told plaintiff that the mold was caused by the floods. From September to October 1984, the Millers renovated the unit; they removed the panelling, put antifungal paint on the walls, replaced the carpeting with wood flooring, and cleaned out the air ducts. In October 1984, plaintiff attempted to move back into the unit, but her allergic reactions worsened and she remained in the unit for only three days; Dr. Epstein advised her to leave the unit.

In October 1984, the Millers moved out of the unit permanently. An October 10, 1984, letter written by plaintiff's husband to defendant stated in pertinent part, "I have owned my unit for over five years and as you know, my building has had a great deal of problems due to the inferior plumbing system. My condominium has been flooded numerous times and the association has replaced my carpeting due to the plumbing failures in the building. . . . [¶] I became engaged to Meredith Labes in June 1984. She has been living with me since January 1983. In the summer of 1983, Meredith began to experience extreme allergic reactions. By late 1983, her condition worsened with the onset of an asthmatic condition. We have discovered the cause of this severe allergic condition: it was a prolonged and severe exposure to a particular mold fungi [sic]. [¶] I had my condo inspected and tested for the presence of mold and the results were positive. . . . As a

result of these findings and after discovering the cause of her illness, we have been unable to live in our condo, and have been living at the Airport Hilton. . . ."

After October 1984, the Millers moved to another condominium and had that unit specifically tested for mold. From October to December 1984, plaintiff continued to see various physicians. A cardiologist, Dr. Rubins, referred her to a psychologist, Dr. Reiter. According to plaintiff's deposition testimony, Dr. Rubins and Dr. Reiter believed that she was making too much out of her medical problems; however, her medical records reveal that they continued prescribing asthma and other medication and pulmonary and other testing.

In December 1984, Dr. Rubins referred plaintiff to Dr. Young, a pulmonary physician at Cedars Sinai Hospital, who diagnosed plaintiff as suffering from asthma. Plaintiff was treated with medication which managed and controlled the asthma; from March through July 1985, plaintiff was in a pulmonary rehabilitation program. Although plaintiff had sporadic asthma attacks, she testified in a deposition that her condition was improving until October 1985, when she had a "severe month long asthma attack" which ended when she took a steroid, prednisone. At this time, she also began to experience, off and on, blurred vision, numbness in her arms and legs, and forgetfulness and confusion, which became worse through December 1985. At about this time, plaintiff saw a psychologist, Dr. Pines. According to plaintiff, Dr. Pines was "very sympathetic" to her claim that no one believed that she was sick and suffering from asthma; Dr. Pines wanted her to see an allergist.

In January 1986, an allergist, Dr. Eitches, diagnosed plaintiff as suffering from a fungal infection or candidiasis, and plaintiff began an antifungal treatment. Dr. Eitches prescribed medication which lessened the symptoms of her fungal infection, including the blurred vision, numbness and tingling of her arms and legs, rashes on her neck and face, and mental confusion; however, the symptoms did not completely go away.

In December 1986, Dr. Levin diagnosed plaintiff as suffering from immune dysregulation, which was caused by having an untreated fungal infection, which infection was caused by exposure to the severe mold in the condominium unit. In her deposition, plaintiff stated that in December 1986, Dr. Levin told her that her immune system was damaged because of the long-term fungus infection since the summer and fall of 1983.

According to Dr. Levin's declaration, at the time of plaintiff's injury, an overwhelming number of physicians were unfamiliar with the disease of

immune dysregulation; moreover "based upon the manifestations of allergic reactions and asthmatic conditions, it was not unusual for any of [plaintiff's] physicians to attribute her condition to an emotional and psychological overreaction. Basically, the manifestation of such symptoms, which are, in fact, the beginning symptoms of immune dysregulation, are often misdiagnosed due to the fact that they appear on the surface to be simply allergic reactions or asthma."

In March 1987, plaintiff began gamma globulin infusion treatment for immune dysregulation. Plaintiff has not suffered from asthma since 1987.

In its answer to the fourth amended complaint, defendant asserted the affirmative defense, inter alia, that plaintiff's cause of action for personal injuries (third cause of action) was barred by the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (3). Defendant moved for summary judgment with respect to plaintiff's claim for damages for personal injuries on the ground that the claim was barred by the one-year statute of limitations because the action, filed in August 1986, was filed over one year after she suffered appreciable harm—asthma and allergies—which she knew were caused by the mold in the unit.

In opposition to the motion for summary judgment, plaintiff admitted that her allergies and asthma were constant and chronic from October 1983 through 1987, but alleged that the allergies and asthma were not the injuries for which she sued; rather, the injury for which she sought recovery was immune dysregulation, which she alleges she discovered in January 1986. Plaintiff maintained that although she experienced asthma and allergic reactions in late 1983, the particular symptoms in October 1985, including blurred vision, memory difficulty, numbness and tingling of extremities and severe premenstrual symptoms, were different and not normally associated with allergies; these new symptoms were manifestations of a different injury, a fungal infection, which developed into immune dysregulation. Plaintiff argued that a triable issue of fact existed as to whether plaintiff's January 1986 discovery of her injury (fungal infection) was reasonable. In reply to the opposition, defendant argued that plaintiff's exposure to mold-infested premises constitutes the invasion of one primary right, which caused her appreciable harm as early as October 1983; treating the later-diagnosed immune dysregulation as the basis for a separate cause of action impermissibly splits her cause of action.

After hearing, the trial court granted defendant's motion for summary judgment. Plaintiff filed timely notice of appeal from the summary judgment. On appeal, plaintiff contends that the trial court did not read and

consider all of the papers and evidence submitted and that the evidence presented triable issues of material fact on the issue of whether the action was barred by the statute of limitations. Specifically, appellant maintains that the facts are disputed and it cannot be determined as a matter of law that the assertion of a cause of action based on immune dysregulation constitutes the impermissible splitting of a cause of action and that the delayed discovery rule is inapplicable.

# I

## SUMMARY JUDGMENT PRINCIPLES

■ Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor; where as here, the moving party is the defendant, he must either negate a necessary element of the plaintiff's case or state a complete defense. (*Preis* v. *American Indemnity Co.* (1990) 220 Cal.App.3d 752, 757 [269 Cal.Rptr. 617].)

A defendant's motion for summary judgment addresses the legal question whether there are undisputed material facts which foreclose the plaintiff's right to relief. (*Panattoni* v. *Superior Court* (1988) 203 Cal.App.3d 1092, 1094 [250 Cal.Rptr. 390].) "We are limited to the facts shown in the affidavits and those admitted and uncontested in the pleadings. (*Classen* v. *Weller* (1983) 145 Cal.App.3d 27, 42-43 . . . .) The caution expressed in these general rules however, should not be allowed to sap the summary judgment procedure of its effectiveness in cases which lack any actual triable issue of fact. [Citation.] . . . ■ Finally, while resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary judgment is proper. (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 . . . .)" (*Uram* v. *Abex Corp.* (1990) 217 Cal.App.3d 1425, 1430 [266 Cal.Rptr. 695].)

■ In reviewing a grant of summary judgment, an appellate court must make its own independent determination of the construction and effect of the papers submitted, and the validity of the ruling is reviewable irrespective of the reasons stated. (*Preis* v. *American Indemnity Co., supra*, 220 Cal.App.3d at p. 757.)

# II

## FAILURE OF TRIAL COURT TO READ MOVING PAPERS

■ Appellant contends that the trial court incorrectly granted summary judgment because all the papers and evidence submitted were not considered.

At the outset of the hearing on the motion for summary judgment, the trial court stated that it could not find any moving papers in the file; the court stated that it was "sufficiently familiar with the facts from the other papers and I will hear argument, and then I will take it under submission and read the moving papers, unless there is nothing additional that will be revealed in the moving papers, in that the reply and the opposition papers gave me enough facts so I can possibly make a decision."

Plaintiff's counsel did not object to this procedure and the motion was orally argued. At the conclusion of the hearing, the court stated that "I am going to grant the motion for summary judgment. Take it up on appeal." Plaintiff's counsel responded that he would do so, and then asked, "This is without reading anything, you are making this conclusion?" The court responded, "Reading what?" Plaintiff's counsel said, "All of my medical records." The court replied, "I read your papers and I read their reply."

As our record on appeal does not contain the minute order for the May 24, 1990, hearing on the motion for summary judgment, appellant has not established that prior to signing the judgment on June 13, 1990, the court did not take the matter under submission and read the moving papers.

Even if our record shows that the trial court did not read the moving papers, the record shows that the court did read the opposition and reply, including defendant's reply to plaintiff's statement of undisputed facts, which summarized all of the evidence submitted as to each fact framed by the parties. Thus, our record indicates that the substance of the moving papers could be gleaned from plaintiff's opposition and defendant's position was repeated in defendant's reply. Even now, appellant fails to establish that there was any critical point or piece of evidence in the moving papers that was not contained in the opposition or reply.

In any event, had the trial court failed to read the moving papers, such failure would not constitute prejudicial error mandating reversal because on appeal we make our own determination of the construction and effect of all of the papers submitted. We thus proceed to discuss the issue of whether summary judgment was properly granted on the ground that as a matter of law the action is barred by the statute of limitations.

### III

#### STATUTE OF LIMITATIONS DEFENSE

A. *Accrual of the Cause of Action.*

In this case, the parties concede that the applicable statute is Code of Civil Procedure section 340, subdivision (3), which prescribes a one-year

period to bring an action "for injury . . . caused by the wrongful act or neglect of another."

"Civil actions, without exception, can only be commenced within the periods prescribed in this title, after the cause of action shall have accrued, unless where, in special cases, a different limitation is prescribed by statute." (Code Civ. Proc., § 312.)

"[I]n order to have an actionable tort there must be a wrongful invasion by the defendant of some legal right of the plaintiff and damage resulting to the plaintiff from the wrongdoing." (*Priola* v. *Paulino* (1977) 72 Cal.App.3d 380, 387 [140 Cal.Rptr. 186].)

The long-standing rule in California is that a single tort can be the foundation for but one claim for damages. (*DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1024, fn. 5 [242 Cal.Rptr. 368].) Accordingly, if the statute of limitations bars an action based upon harm immediately caused by defendant's wrongdoing, a separate cause of action based on a subsequent harm arising from that wrongdoing would normally amount to splitting a cause of action. (See *id.*, at p. 1021.)

■ "[A]lthough a right to recover nominal damages will not trigger the running of the period of limitation, the infliction of appreciable and actual harm, however uncertain in amount, will commence the statutory period. Under present authority, neither uncertainty as to the amount of damages nor difficulty in proving damages tolls the period of limitations." (*Davies* v. *Krasna* (1975) 14 Cal.3d 502, 514 [121 Cal.Rptr. 705, 535 P.2d 1161].)

■ As explained in *DeRose* v. *Carswell, supra*, 196 Cal.App.3d at pages 1021-1022: "There are times when a tort initially causes injuries so insubstantial that it is not reasonable to expect the victim to file a lawsuit, even though she would be entitled to at least nominal damages. When such a person does not sue, and later suffers substantial injuries that do justify a lawsuit, the statute of limitations may already have run. This is because the limitations period begins to run, under the traditional view, as soon as the plaintiff is aware of any harm, however slight. [Citation.] [¶] More recently, courts have modified the traditional rule in order to avoid punishing the plaintiff, who, having acted reasonably in not prosecuting a lawsuit for insignificant damages, later suffers more substantial harm. The Supreme Court in *Davies* v. *Krasna, supra*, observed that 'we have drifted away from the view held by some that a limitations period necessarily begins when an act or omission of defendant constitutes a legal wrong as a matter of substantive law. . . . Rather we generally now subscribe to the view that

the period cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages.' (14 Cal.3d at p. 513.)"

Accordingly, "[t]he extent of damage is not an element of a cause of action in tort, and the general rule is that the cause of action is complete on the sustaining of 'actual and appreciable harm,' on which the recoverable damages would be more than nominal." (*Evans* v. *Eckelman* (1990) 216 Cal.App.3d 1609, 1620 [265 Cal.Rptr. 605].)

Appellant maintains that triable issues of fact exist on the issue of whether her cause of action accrued by virtue of her 1983 and 1984 experiences of asthma and allergies. She argues that respondent failed to establish with medical evidence that her asthma and allergies experienced in 1983 and 1984 constitute injuries for which she could have sued, or were caused by the mold. She also argues that the more severe and debilitating symptoms which began in October 1985 (including numbness of the extremities, memory difficulty, headaches, and blurred vision) were symptoms of a different "injury," a fungal infection (later diagnosed as immune dysregulation), and the record does not compel the finding that the assertion of this latter injury constitutes splitting a cause of action.

In addressing the issue of "appreciable and actual harm," we turn first to the allegations of the complaint itself. "A defendant moving for summary judgment may rely on the allegations contained in the plaintiff's complaint, which constitute judicial admissions. As such they are conclusive concessions of the truth of a matter and have the effect of removing it from the issues." (*Uram* v. *Abex Corp., supra,* 217 Cal.App.3d 1425, 1433.)

According to the facts alleged in the fourth amended complaint, Miller experienced "allergies and had minor incidents of asthma" in September and October 1983; in May and June 1984, she began to experience "further and more severe bouts of asthma"; in July 1984, Miller was "hospitalized for her worsening condition," and was "diagnosed as suffering from allergies, asthma, and an episode of mitral valve prolapse, a heart condition . . . ."

In her response to the defendant's separate statement of undisputed facts, Miller also agreed it was undisputed that in October 1984, her husband's letter to the defendant stated that the flooding caused mold which caused her to experience extreme allergic reactions in the summer of 1983; in June 1984, her condition prevented her from pursuing her career; in August 1984,

upon the advice of her doctor, her unit was tested for mold contamination; in October 1984, the Millers retained a microbiologist to pinpoint the source of the mold; Miller's symptoms worsened when she returned to the unit for three days in October 1984; she moved out of the unit permanently in October 1984.

Given the above facts, reasonable minds can draw only one conclusion—that Miller suffered appreciable and actual harm within the meaning of *Davies* by October 1984 and that she was also aware of its negligent cause by October 1984.[2] Such appreciable and actual harm consisted of conditions characterized by appellant herself as "extreme allergic reactions," and "severe bouts of asthma," for which she sought medical advice and treatment. We conclude that as a matter of law, such harm is sufficient to commence the running of the statute of limitations. This is so whether the mold, alone or in conjunction with other factors, caused her allergies and asthma in the first instance, triggered a predisposition to allergies and asthma, or aggravated them as preexisting conditions. ■■■ Under general principles of tort law, it is "not necessary that the negligence of the defendant be the sole proximate cause of the damage, but there may be other factors which contribute to the extent of the damage" (*Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 704 [39 Cal.Rptr. 64]), and "damages may be recovered for aggravation of a preexisting condition . . . ." (*Taylor* v. *Sims* (1945) 72 Cal.App.2d 60, 65 [164 P.2d 17].) ■■■ Accordingly, whether the mold alone or in conjunction with other factors caused Miller appreciable harm is not a *material* factual issue pertinent to the statute of limitations defense.

The fact that Miller's medical condition may not have been diagnosed correctly until 1986 does not delay the running of the statute of limitations

[2]This case does not present the issue of belated discovery of the element of defendant's alleged negligence or wrongdoing, as the pleadings contain no allegations pertinent to this theory, Miller does not address this issue in her briefs on appeal, and the only conclusion to be drawn from the undisputed facts is that by October 1984 Miller knew that defendant's alleged negligent failure to repair and maintain the plumbing caused the mold, which caused her to experience allergic reactions and asthma.

Nor is the question of whether immune dysregulation is a permanent or continuing condition pertinent to the issue of *when* defendant's wrongdoing caused Miller actual and appreciable harm and when the statute of limitations began to run.

In her opening brief, appellant disingenuously states that she "is not claiming that these earlier 'injuries' were caused by mold, nor is the evidence 'without substantial contradiction' on this point." However, Miller specifically agreed it was undisputed that "As of October 1984, the mold was a factor contributing to [her] injury." Further, Dr. Levin's declaration submitted in opposition to the motion for summary judgment motion states that "In essence, Ms. Miller's immune dysregulation was triggered by the heavy and prolonged mold exposure she received while she was residing at the unit," that in October 1983, "her allergies and asthma were the first indication of the true extent and nature of her injury of immune dysregulation," and the manifestation of allergic reactions and asthmatic conditions "are, in fact, the beginning symptoms of immune dysregulation."

under the facts of this case. (See, e.g., *Uram* v. *Abex Corp., supra,* 217 Cal.App.3d 1425, 1432.) Whatever label or diagnosis her doctors may have attached, or failed to attach, to her condition in 1983 and 1984, such diagnosis did not prevent Miller from being aware that defendant's negligence caused her harm. She cites no authority for the proposition that a cause of action cannot accrue until a plaintiff can attach a medical diagnosis, whether correct or incorrect, to her condition, even though plaintiff suffers harm and is aware of its negligent cause. We conclude that as a matter of law on this record, her 1983 and 1984 injuries constituted actual and appreciable harm.

Appellant relies heavily on *Martinez-Ferrer* v. *Richardson-Merrell, Inc.* (1980) 105 Cal.App.3d 316 [164 Cal.Rptr. 591], which appellant claims compels reversal of the summary judgment against her. Not only is *Martinez-Ferrer* easily distinguishable on its facts from the instant case, but it has been soundly criticized as reading *Davies* v. *Krasna, supra,* 14 Cal.3d 502, too restrictively and disregarding the rule against splitting a cause of action. (*DeRose* v. *Carswell, supra,* 196 Cal.App.3d 1011, 1024-1025.)

In *Martinez-Ferrer,* the court of appeal reversed summary judgment in favor of a drug manufacturer and distributor which the trial court had granted on the ground that plaintiff's action for personal injuries (cataracts) filed in June 1976 was barred by the one-year statute of limitations. Plaintiff, a physician, took a drug, MER/29, for a high cholesterol condition in March 1960; in September 1960, plaintiff was unable to read; his doctor diagnosed his condition as macula edema, an acute allergic reaction of the backs of his eyes, and speculated that plaintiff's condition was caused by the drug, which he advised plaintiff to stop taking; a few weeks after the eye problems, plaintiff developed a severe case of dermatitis, which his doctor concluded was likely caused by the drug. Plaintiff's dermatitis cleared up in four or five months and his eyes got better. Plaintiff had no further eye problems until 1976, when cataracts were discovered; plaintiff's doctor determined the cataracts had been caused by the MER/29. In 1961, the manufacturer of MER/29 sent letters to all doctors in the United States warning them that patients who had received the drug reported cataracts and icthyosis, a form of dermatitis; in 1962 the drug was taken off the market.

The court in *Martinez-Ferrer* noted that plaintiff "makes no claim that his 1960 problems were caused by MER/29 and unless the record establishes without substantial contradiction that they were, the summary judgment must be reversed whatever [plaintiff] knew or, rather, thought he knew at the time." (*Martinez-Ferrer* v. *Richardson-Merrell, Inc., supra,* 105 Cal.App.3d at p. 321.)

The court in *Martinez-Ferrer* concluded that the "record does not compel a finding that the 1960 symptoms were caused by MER/29" (105 Cal.App.3d at p. 321), and that "for reasons rooted in the nature of summary judgments plaintiff is entitled to a reversal." (*Id.*, at p. 322.) Although this ground alone would have been sufficient to reverse the judgment, and would have been justified under *Davies* v. *Krasna, supra*, 14 Cal.3d 502, the court of appeal did not stop there; it went on: It speculated that "any realistic assessment of the record compels the conclusion that at the trial it will be found that MER/29 did cause at least some of Raul's [plaintiff's] 1960 problems—most likely dermatitis. The real question for the trial court will therefore be whether Raul can proceed against defendants on the theory that his cataracts were caused by MER/29, even though his action was filed years after he knew or should have known that he had suffered some bodily injuries from that product." (105 Cal.App.3d at p. 322.)

All of the discussion in *Martinez-Ferrer* that follows the latter statement is technically dicta, as it is premised on a set of hypothetical facts which the court speculated would be found in the future.[3]

Unlike *Martinez-Ferrer*, there is no dispute in our case that the plaintiff's earlier condition in 1983 and 1984 was caused by the mold. Moreover, we decline to follow the *Martinez-Ferrer* court's conclusion, in dicta, that there is a trend away from inflexible enforcement of the rule against splitting a cause of action.

The court in *Martinez-Ferrer* seemed to imply that the 16-year delay between the plaintiff's earlier eye problem and dermatitis and his development of cataracts was the factor that created injustice in application of the rule against splitting a cause of action: "The sad fact is that Raul would have been laughed out of court had he sued for his dermatitis and macula edema

---

[3]For example, the court went on to state that the instant case did not permit it to conclude that the 1960 problems were so minimal that they did not trigger the running of any cause of action. "Unfortunately, however, the facts will not permit us to agree. In 1960 Raul obviously suffered substantial damages, including a substantial loss of earnings." (105 Cal.App.3d at p. 325.) Given these assumed facts, the court acknowledged that the prohibition against splitting a cause of action barred plaintiff's action, but blithely decided not to enforce that principle because "it would lead to injustice." (105 Cal.App.3d at p. 326.) The court also concluded that "permitting Raul to proceed advances, rather than hinders, the policies which support the statute of limitations in general, as explained in *Davies* v. *Krasna* . . . . Turning more specifically to the rule against splitting causes of action we perceive a trend away from an unthinking enforcement of the rules." (*Ibid.*) The court then discussed the rules pertaining to nuisance actions, progressive occupational diseases, and the purported relaxation of the merger aspect of res judicata. Finally, the court stated that "We make no attempt to even summarize where all of this may lead. We are, however, convinced that under the peculiar circumstances of this case it would be a miscarriage of justice not to permit plaintiff to go to trial." (*Id.*, at p. 327.)

when defendants say he should have—say in 1962—and had he then attempted to be compensated for the speculative possibility that his 1960 ingestion of MER/29 might cause cataracts before that chance became a fact in 1976. On the other hand, under our statutory scheme . . . Raul would have been quite unable to keep his action alive for a decade and a half." (105 Cal.App.3d at pp. 323-324.)

There is no similar delay and no similar injustice under the facts of the instant case because it is undisputed that by 1987 Miller not only obtained a correct diagnosis of her condition, but had received treatment for it; she has not suffered from asthma since 1987. Therefore, had she brought her action within one year of October 1984, her action most likely would have been pending after the time that she apparently had suffered most, if not all, of the harm caused by the mold. The purported injustice that may have existed under the circumstances of *Martinez-Ferrer* is simply not present in our case.

Even were we to adopt the suggestion in *Martinez-Ferrer* and apply the rule with respect to nuisance cases, such rules lend no support to appellant's position herein. ██ The well-settled rule with respect to property damage caused by nuisance is that "[i]f appellants demonstrate that whatever nuisance caused by defendant is continuing in nature, every repetition of the wrong may create further liability. Hence the statute of limitations would not run merely from the original intrusion . . . ." (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 937 [101 Cal.Rptr. 568, 496 P.2d 480].) The court in *Nestle* stated that "it would be incongruous for each repetition to be considered a separate wrong for property damage purposes but not for personal injuries." (*Ibid.*)

██ Even if we deem each of Miller's exposures to the mold as a separate wrong, the last such exposure occurred in October 1984, after which time she moved out of the unit permanently. Miller testified that when she moved from a hotel back into the unit for three days in October 1984, her asthma became more severe. After permanently moving out of the unit, Miller suffered sporadic asthma attacks. One of her doctor's progress records for January 9, 1985, states: "She has ongoing respiratory difficulties, ongoing chest tightness, but her lungs remain totally clear when she is in the office. Her contention is that because of faulty pipes in her apartment building, the rooms became moldy. Studies in Stewart Epstein's office show she [is] allergic to mold." Miller admitted in her deposition that between October 1984 and October 1985, she continued to have sporadic asthma attacks.

Accordingly, even if Miller's exposure to the mold on the last day she resided in the unit constitutes a separate wrong, she suffered actual and

appreciable harm from that wrong immediately and the statute of limitations on that "separate wrong" would have begun to run in October 1984, barring the complaint filed herein in August 1986. A different result is not compelled by *Howe* v. *Pioneer Mfg. Co.* (1968) 262 Cal.App.2d 330 [68 Cal.Rptr. 617], which is also distinguishable from the facts of the instant case.

In *Howe*, plaintiffs appealed from summary judgment in favor of their landlord and the manufacturer of a gas furnace which allegedly was defective and dangerous and leaked gas into their premises, causing them personal injuries, on several different occasions between December 1960 and January 1964; plaintiffs alleged that in December 1960 they took possession of the premises for a four-year period; their illness was unexplained and undetermined until January 1964 when it was discovered that gas from the defective furnace had been permeating the premises; the action was filed in October 1964; plaintiffs sought to recover for only those injuries occurring within one year of filing suit. The appellate record was apparently limited to the pleadings and excerpts from depositions and it was not clear therefrom "whether there was one continuing or cumulative illness, or separate illnesses." In concluding that plaintiffs "should be permitted to show that such injuries were separately incurred" (262 Cal.App.2d at p. 348), the court also cautioned that "This is not to say that upon trial the facts may not show that plaintiffs knew or should have known at an earlier date that the furnace was defective, and they knew or should have known that their injuries resulted therefrom. These are matters of defense and do not defeat the right to sue for a separate injury if such in fact was incurred within one year of filing suit. The following comment is pertinent: 'This discussion should not conclude without underscoring that, in liberally construing and asserting the depositions most favorably to appellant (as we are required to do), we are stating that which has not yet been proved and may never be. We have merely accepted the appellant's story. Summary judgment and demurrer reversals are untrustworthy source materials for fact finders.'" (262 Cal.App.2d at pp. 348-349.)

It is clear that the court in *Howe* was working not only with a different set of facts, but with a more limited factual record than we have in the instant case. *Howe* lends no support to appellant's position that triable issues of fact exist as to whether the statute of limitations bars her action.

B.  *Delayed Discovery Rule.*

Appellant contends that because her injury involved a progressively developing disease, whose nature and extent was not readily discoverable, a triable issue of fact was presented as to whether she was diligent in discovering her injury under the delayed discovery rule.

"[T]he common law rule, that an action accrues on the date of injury (*Lambert* v. *McKenzie* (1901) 135 Cal. 100, 103 . . . ), applies only as modified by the 'discovery rule.' The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. [Citation.] A plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." (*Jolly* v. *Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1109 [245 Cal.Rptr. 658, 751 P.2d 923], fn. omitted.)

The delayed discovery doctrine applies only when a plaintiff has not discovered all of the facts essential to the cause of action; if the plaintiff has discovered all of the essential facts, the doctrine does not apply. (See *Spellis* v. *Lawn* (1988) 200 Cal.App.3d 1075, 1080 [246 Cal.Rptr. 385].) There is no dispute in this case that Miller had actual knowledge of the negligent cause of her 1983 and 1984 injuries at the latest by October 1984; the fact that she subsequently suffered from immune dysregulation is a fact that does not give rise to a separate cause of action. Moreover, later-discovered information that her asthma and allergies were actually early manifestations of a condition known as immune dysregulation was not essential to any asserted cause of action and did not stop the running of the statute of limitations.[4] We conclude that the delayed discovery doctrine does not apply under the circumstances of this case.

C. *Reliance on Physician's Misdiagnosis.*

Relying on *Brown* v. *Bleiberg* (1982) 32 Cal.3d 426 [186 Cal.Rptr. 228, 651 P.2d 815], a case involving an action against the physicians who allegedly caused plaintiff's injury, appellant contends that the statute of limitations should be tolled in the instant case because of her reliance on her physicians' advice and misdiagnosis from 1983 to 1985. As this case is not one against physicians who allegedly misdiagnosed appellant's condition, *Brown* is inapposite. As appellant fails to support the contention with any applicable authority, we find it without merit.

---

[4]In her reply brief, appellant states that "Dr. Levin never testifies that the allergy and asthma were manifestations of this particular condition in this particular patient." That appellant's asthma and allergies were early manifestations of her immune dysregulation is the *only* reasonable inference to be drawn from Levin's declaration, and there is nothing in our record which creates a dispute of fact on this point.

Further, it is inconsistent for appellant to maintain on the one hand that such conditions were *not* early manifestations, and on the other hand to maintain that her other physicians *misdiagnosed* her condition. If her asthma and allergies were not early manifestations of immune dysregulation, there was no misdiagnosis.

## DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.**—I concur in the judgment because the facts of this case do not compel application of the landmark decision in *Martinez-Ferrer* v. *Richardson-Merrell, Inc.* (1980) 105 Cal.App.3d 316 [164 Cal.Rptr. 591]. I write separately, however, to register my disagreement with the majority's treatment of the important rule and supporting rationale enunciated in that decision. Unlike the majority, I do not adopt the *DeRose* (*DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1024 [242 Cal.Rptr. 368]) court's characterization of the decision as a "too restrictive" application of the Supreme Court's decision in *Davies* v. *Krasna* (1975) 14 Cal.3d 502 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807] (reiterating the rule the statute of limitations commences running when a plaintiff suffers actual and appreciable harm). Instead, I read *Martinez-Ferrer* as embodying a distinct rule. Under appropriate circumstances the occurrence of some actual and appreciable harm will not foreclose a later suit for a serious physically distinct injury which first manifests itself after the limitations period has expired as to the initial harm.

*Martinez-Ferrer* highlighted the problem of plaintiffs who experience symptoms of "actual and appreciable" harm early on but much later suffer a different type of harm, quantitatively and qualitatively, as a result of the initial tortious act. Historically, of course, the law would have barred such plaintiffs from bringing suit for the later, more serious injury because the cause of action accrued upon the act or omission that caused the legal harm whether or not there were manifestations of injury. (See generally, *Developments in the Law—Statutes of Limitations* (1950) 63 Harv. L. Rev. 1177.) This harsh rule was later tempered by the adoption of the discovery rule under which a cause of action was held not to have accrued until the plaintiff knew or reasonably should have known of the injury and its cause. (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 186-190 [98 Cal.Rptr. 837, 491 P.2d 421].) The rules for determining when a cause of action accrued were further liberalized by the Supreme Court's decision in *Budd* v. *Nixen* (1971) 6 Cal.3d 195, 200 [98 Cal.Rptr. 849, 491 P.2d 433], which held the limitations period does not begin until a plaintiff has suffered "actual and appreciable harm."

It is true the discovery doctrine led to more just and equitable results in that a plaintiff was not precluded by the bar of the statute of limitations from

seeking recovery until there was actual evidence of injury from a tortious act or omission which may have occurred years before. This doctrine was inadequate, however, to prevent the inequities that arose in situations where exposure to deadly toxic substances caused not only immediate injuries but latent or progressive diseases which did not manifest themselves until possibly decades later. Rigid application of the discovery doctrine meant plaintiffs who had some early minor symptoms of harm were barred from bringing suit for a later developed, related, but qualitatively and quantitatively different, illness.

*Martinez-Ferrer* recognized principles of res judicata should not bar suit for the later more serious injury in these circumstances. The *Martinez-Ferrer* court found the general rules of merger and bar should not apply where "the policies favoring preclusion of a second action are overcome *for an extraordinary reason.* . . ." or "[t]he judgment in the first action was plainly inconsistent with the *fair and equitable implementation of a statutory or constitutional scheme.* . . ." (*Martinez-Ferrer* v. *Richardson-Merrell, Inc., supra,* 105 Cal.App.3d at p. 327, internal quotation marks deleted, italics added.)

The policies underlying the doctrine of res judicata and the prevention of claim splitting include judicial economy and concern about the quality of evidence available at trial. (*Davies* v. *Krasna, supra,* 14 Cal.3d at p. 512 ["The fundamental purpose of such statutes is to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh."]; *Elkins* v. *Derby* (1974) 12 Cal.3d 410, 417 [115 Cal. Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839] [purpose of statutes is to prevent " 'surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' " (Citing *Telegraphers* v. *Ry. Express Agency* (1944) 321 U.S. 342, 348-349 [88 L.Ed. 788, 792-793, 64 S.Ct. 582].)]; *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 229 [153 P.2d 325] ["The underlying purpose of statutes of limitation is to prevent the unexpected enforcement of stale claims concerning which persons interested have been thrown off their guard by want of prosecution."].)

These same concerns support allowing independent suits for the different injuries as well. First, considerations of judicial economy in these circumstances weigh in favor of recognizing separate causes of action. Allowing suit on the later developed, serious injury avoids forcing a plaintiff to make speculative claims early on as a means to escape the bar of the statute of limitations. Recognizing a separate accrual period for the separate injury when and if it occurs will prevent courts from being burdened with suits

involving relatively minor injuries filed to avoid the bar of the statute of limitations should more serious injuries develop. It would also discourage the filing of premature or questionable claims. It would be more efficient, and society would be better served, if judicial resources were reserved for lawsuits which seek compensation for the more serious, yet physically distinct, harm when and if it materializes.

Secondly, where a plaintiff is forced to bring suit at the first indication of "appreciable" harm, claims for a possible eventual disease will not be based on actual evidence of injury but on speculation or evidence of probabilities only. It is possible immediate accrual of all contingent claims would better serve defendants' interests in repose. However, evidentiary concerns of the existence of a prospective disease, its proximate cause and resulting damage, are better served by presentation of actual evidence which has developed over time. Plaintiffs will have a better chance of securing fair and accurate compensation for an existing harm when the injury has manifested itself and when medical certainty can replace speculation.

Thirdly, allowing suit on a later developed, different and more serious injury, eliminates the risk of defendants overcompensating a plaintiff who does not in fact develop future problems or undercompensating those plaintiffs who do. Allowing suit for an actual injury based on current and reliable evidence prevents the inequity of giving a windfall to some plaintiffs and undercompensating others.

Many decades elapsed before society became aware of the dangers of asbestos and other toxic chemical substances in our environment. With new sciences and scientific discoveries continually placing heretofore unknown substances on the market, and with the constant introduction of new drugs, synthetics and biologically altered plants and animals, we may be largely ignorant of all the ramifications of our technologically advanced society. Preservation and amplification of the *Martinez-Ferrer* doctrine is needed to protect those individuals presently or in the future who belatedly discover exposure to a new drug, solvent or structural material caused not only the initial "actual and appreciable" yet only modest illness or injury, but also the present deadly cancer or respiratory failure or similar insidious injury which was far more serious and physically distinct from the initial manifestations of the exposure.

Under *Martinez-Ferrer* these plaintiffs' claims will accrue upon discovery of the later developed and different disease if and when it occurs as a result of the initial injury. Treating the different injuries separately for purposes of accrual of the cause of action is the only just and equitable method to

compensate victims of latent, progressive or presently unknown diseases. It protects plaintiffs who suffer progressive diseases that take years to develop after the initial exposure to a toxic substance. It also preserves a cause of action for those plaintiffs, who because of the new drug, substance or technology, are unaware the initial symptoms could also mean a risk of a much more deadly and dangerous disease in the future.

The rationale exemplified in *Martinez-Ferrer* preserves these plaintiffs' interests, and establishes an equitable method to deal with the unknown consequences of today's technological advances. The decision is significant in California jurisprudence and has been recognized or adopted in numerous other jurisdictions as well. (*Associated Indem. Corp.* v. *Indus. Acc. Com.* (1932) 124 Cal.App. 378 [12 P.2d 1075] [despite early symptoms years before filing suit, worker's claim did not accrue until injury progressed to silicosis]; *Urie* v. *Thompson* (1949) 337 U.S. 163 [93 L.Ed. 1282, 69 S.Ct. 1018, 11 A.L.R.2d 252] [same]; *Zambrano* v. *Dorough* (1986) 179 Cal.App.3d 169 [224 Cal.Rptr. 323] [cause of action did not accrue as to later injury because loss of reproductive capacity was qualitatively of a different type of injury than that initially accompanying the misdiagnosis]; *Wilson* v. *Johns-Manville Sales Corp.* (D.C.Cir. 1982) 684 F.2d 111 [221 App.D.C. 337] [mild asbestosis did not start limitations period running in 1973 for separate and distinct disease of mesothelioma first manifested in 1978]; *Pierce* v. *Johns-Manville Sales Corp.* (1983) 296 Md. 656 [464 A.2d 1020] [in same factual situation, held policy considerations weighed in favor of recognizing separate causes of action lest plaintiff be compelled to rush to court with questionably meritorious claims rather than risk losing all claims for future serious injury]; *Goodman* v. *Mead Johnson & Co.* (3d Cir. 1976) 534 F.2d 566 [plaintiff's cause of action for cancer did not accrue simultaneously with manifestations of thrombophlebitis although both caused by defendant's contraceptive device]; *Anderson* v. *W.R. Grace & Co.* (D.Mass. 1986) 628 F.Supp. 1219 [in suit for injuries caused by contaminated water well, causes of action for increased risk of leukemia and other cancers not yet accrued because qualitatively different from present injuries]; *Gore* v. *Daniel O'Connell's Sons, Inc.* (1984) 17 Mass.App. 645 [461 N.E.2d 256, 259] ["Not only does it offend fairness to require of claimants the gift of prophecy, [citation] but it is unsound judicial policy to encourage the initiation of lawsuits in anticipation that a grave disease will manifest itself pendente lite."].)

The facts of this case, however, do not compel a finding the cause of action for Miller's later developed immune dysregulation was so qualitatively or quantitatively different from the initial symptoms of asthma and allergies as to be treated as a different injury for purposes of accrual of a

separate cause of action. Mold in the condominium was the cause of all the symptoms. The later developed immune dysregulation was a result of infection caused by prolonged exposure to the mold of which Miller's symptoms of asthma and allergies were early manifestations. When a later developed disease is the natural and probable consequence of failure to treat the initial symptoms of the same disease, the two diseases are not sufficiently physically distinct and *Martinez-Ferrer* does not apply.

Because I conclude *Martinez-Ferrer* does not apply on the facts of this case, I concur in the judgment.