[No. B060125. Second Dist., Div. Seven. Feb. 26, 1992.]

WILLIAM S. COTTLE et al., Petitioners, v.
THE SUPERIOR COURT OF VENTURA COUNTY, Respondent;
OXNARD SHORES COMPANY et al., Real Parties in Interest.

**COUNSEL**

Rucker & Clarkson, Fred Rucker and John P. Doyle for Petitioners.

No appearance for Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Christopher P. Bisgaard, Allyn O. Kreps, John H. Shimada, Judith A. Zipkin, Arter, Hadden, Lawler, Felix & Hall, Stephen T. Swanson, Bart L. Kessel, Lawler, Bonham & Walsh, Byron J. Lawler, Carol A. Woo, Murchison & Cumming, Cindy Hiroto Roberts, Kenneth H. Moreno, Beth E. Graff, Nordman, Cormany, Hair & Compton, Glen M. Reiser and Jonathan Fraser Light for Real Parties in Interest.

OPINION

WOODS (Fred), J.—

## INTRODUCTION

Petitioners herein are plaintiffs in one of two consolidated toxic tort actions. Petitioners are known as the Cottle plaintiffs.[1]

In the underlying action, approximately 175 owners and renters of certain residential properties located in the Oxnard Dunes (the Dunes) residential subdivision in Oxnard, California sued various defendants (some of whom are real parties in interest herein) for personal injuries (both physical injuries and emotional distress injuries) and property damages as a result of defendants' construction and development of the Dunes on a site that for many years had been used as a dumping ground for certain oil industry hazardous wastes and other by-products. In particular, plaintiffs allege that they suffered injuries due to defendants' failure to disclose the prior use of the property.

After preliminary orders and hearings, the trial court issued an order excluding petitioners from submitting evidence at trial that their personal physical injuries were caused by exposure to chemicals at the Dunes. Petitioners sought review of that order by way of a writ petition, and we granted review. We conclude that the court acted within its authority, affirm its order as clarified and deny the petition for a writ of mandate.

## FACTUAL AND PROCEDURAL SYNOPSIS

In the complaint,[2] each Cottle plaintiff claimed to have sustained a myriad of physical injuries and ailments ranging from: "liver damage, suppressed

[1] The 40 Cottle plaintiffs consist of 12 former tenants, 6 current tenants, 21 nonresident property owners and the surviving wife of a deceased gardener who worked at a home in the Oxnard Dunes.

The plaintiffs in the other action are known as the Dolan plaintiffs. Each group of plaintiffs is represented by separate counsel. Although the Dolan plaintiffs are referred to in the opinion, they have not joined in this writ petition or filed any response to it.

Not all real parties in interest have filed pleadings pertaining to the writ petition. For the purposes of this petition, we can discern no reason to identify the various defendants other than to refer to them at times.

Petitioners are referred to as the Cottle plaintiffs or petitioners. Plaintiffs is used to refer to both groups of plaintiffs. Real parties in interest are generally referred to as defendants.

[2] Although the court refers to the fourth amended Cottle complaint, only the subcomplaint/third amended complaint is contained in the record before us. We presume the wording of the complaints is similar.

immune systems, increased susceptibility to leukemia, malignant neoplasms and other forms of cancer, risk of cancer, reproductive toxicity, birth defects, chromosomal damage, environmental acquired immune deficiency syndrome, respiratory diseases, neurological damage, mutagenesis, still births . . . ."

Early on in the litigation, the court determined that this case was a complex litigation case under section 19 of the California Standards of Judicial Administration.

In April 1989, plaintiffs responded to a master set of interrogatories. Interrogatory number 65 read:

"If you contend that you suffer any past, present or future INJURY OR ILLNESS due to EXPOSURE to CHEMICAL SUBSTANCES which resulted from the acts, errors or omissions of any defendant, give a detailed description of each such INJURY OR ILLNESS. Your description should include the inclusive dates during which you suffered from each INJURY OR ILLNESS."

The standard answer read:

"Objection: This interrogatory calls for both an expert medical opinion and a legal opinion as to the causal connection between exposure to chemical substances and negligent acts by the defendants. Plaintiff at this time cannot identify any injuries caused by exposure to chemical substances. However, plaintiff reserves all rights to assert claims for such injuries as more information becomes available."

The responses to other interrogatories inquiring into the identification of chemical substances to which plaintiffs had been exposed and the facts supporting their injury or illness and the manner of exposure were substantially the same.

In November 1990, The California Department of Health Services (DOHS) issued a draft remedial action plan and a remedial investigations report concerning the Dunes. The remedial report concluded that: "The waste materials do not pose any significant threat to the health of the residents living at the Dunes Subdivision . . . or to the environment."

The remedial action plan was issued in final form in June 1991. The final report concludes that: "The Department has determined that the wastes, at present condition, do not pose any significant risks to public health or to the environment. Therefore, no further action is required at this site. The site will be delisted from the Hazardous Waste Bond Expenditure Plan List."

On November 7, 1990, the court filed its case management order which provided that: "Each plaintiff shall file and serve a statement establishing a prima facie claim for personal injury and/or property damage. [¶] A. For personal injury claims, each plaintiff shall state the chemical or toxic substance to which that plaintiff was exposed; the date or dates and place of exposure; the method of exposure; the nature of plaintiff's injury; and the identity of each medical expert who will support the plaintiff's personal injury claim."

The case management order provided that the court "will issue Orders to Show Cause on its own motion as to why evidence should not be excluded at trial on behalf of any plaintiff who has failed to file such a statement." The case management order set February 1, 1991, as the deadline for plaintiffs' designation of experts and provided that: "No other witness will be permitted to testify as plaintiffs' expert, except upon order of the court based upon a showing of good cause."

Petitioners did not move for reconsideration or seek appellate review of the prima facie requirement.

Both groups of plaintiffs filed their statement of personal injury and property damages on January 7, 1991. In their uniform statement, the Cottle plaintiffs stated that: "it is virtually impossible to determine exactly how each Plaintiff resident was exposed, and to link the manner of chronic low level exposure to the symptoms manifested," and "[i]t is virtually impossible to determine specifically and exactly *which* of the substances . . . present at the Dunes, each individual Plaintiff resident has been exposed to, *exactly* in what amounts (dosages), and precisely when." (Original italics.) Almost exactly the same language was used in the Dolan plaintiffs' uniform statement.

The Cottle plaintiffs also stated that: "[n]one of the Plaintiff residents have specifically been diagnosed by his/her treating physician as suffering from injury caused directly by exposure to the hazardous substances found in or around the Dunes," (fn. omitted), and "[t]he treating physicians were without benefit of knowing of the toxic exposures." Again, the Dolan plaintiffs used almost exactly the same language in their uniform statement.

The individual statements of the Dolan plaintiffs echoed that the individual plaintiff had not yet been diagnosed as suffering from injury caused by exposure and listed the known injuries, symptoms and complaints of the individual plaintiff.

In the individual statements of the 40 Cottle plaintiffs, the 21 nonresident owners stated that they did not claim personal injury damages. Of the 21

nonresident owners, who all made emotional distress claims, 10 listed physical symptoms as part of their emotional distress claims. Of the remaining 19 residents, for 6 people, the only personal injury damages listed was emotional distress, and for 1 person, the only personal injury damages listed were emotional distress and loss of consortium. In other words, only 12 of the Cottle plaintiffs claimed to have suffered any personal physical injury due to exposure to chemicals at the Dunes.

Petitioners seem to link to the Dunes every physical infirmity or malady that they had suffered since becoming connected to the subdivision—headaches, dizziness, bronchitis, breathing problems, skin rashes, eye irritation, sinus problems, lack of energy, throat irritation, insomnia, muscle aches and cramps, stomach problems, diarrhea, ear infections, arthritis, and chronic colds and flu.

The court set a March 4, 1991, hearing on a motion to dismiss all plaintiffs' personal injury, emotional distress and property damages claims for failure to make the court-ordered prima facie showing.

The court found that plaintiffs had established their prima facie cases regarding their emotional distress and property damages claims, but not their personal physical injury claims.

In its March 12, 1991, ruling on submitted matter, the court stated that: "Implicit in this announced sanction [for failing to file a statement] was the ability to find that a prima facie showing had not been made, and to exclude evidence despite the actual filing of the document."

The court tentatively ordered the exclusion of "all evidence, by lay or expert witnesses, that plaintiffs have or will suffer any particular injury or illness based on exposure to toxic substances in the Dunes" unless plaintiffs could demonstrate by May 31, 1991, that viable claims for personal injury existed.

Petitioners again did not move for reconsideration or seek appellate review of the prima facie requirement.

On March 21, 1991, the McGrath defendants moved to delay the independent medical examination proposed for each of the plaintiffs in light of the plaintiffs' inability to set forth a prima facie showing of physical injury. The court granted the motion.

At the April 10, 1991, hearing on that motion, Fred Rucker, counsel for petitioners, raised the issue of the contemplated supplemental statements.

The court advised counsel that it was the court's hope to "actually widdle [*sic*] down specific physical illnesses or conditions or injuries that *some medical person could testify to the appropriate medical degree* [were] related to the toxics." (Italics added.)

The court also stated that: "I certainly would consider as a prima facie case if the medical personnel couldn't limit it to one toxic but that the toxic found there caused a linkage, make some synergistic effect. I wouldn't require the one, but there does need to be that *cause and effect* by that individual." (Italics added.)

Both groups of plaintiffs filed supplemental statements on May 31, 1991. The Dolan plaintiffs stated that: "it is not realistic to assign a specific chemical on a specific piece of realty to a specific injury or disease of a specific Plaintiff" and that it was "impossible to assign specific chemicals as having caused specific conditions in specific individuals."

In part, the Cottle supplemental statements consisted of three declarations —one by a toxicologist and two by neuropsychologists. Petitioners also incorporated by reference the declarations of Doctors Broughton, Rust and Adin, which were part of the Dolan plaintiffs' supplemental statements.

In response, the McGrath defendants filed a motion for issuance of a final order excluding all plaintiffs' personal injury claims.

The court held a hearing on June 27, 1991, to determine whether the supplemental statements established a prima facie claim for personal physical injury.

At the hearing, the court stated that: "It's my view, after reading the original and then the supplemental prima facie showings, that there is no witness or witnesses who can testify, that I know of—none have been presented to me—that any hazardous or toxic substance has, to a reasonable medical probability, a certainty or anything beyond the most tenuous possibility caused any illness in any plaintiff or injured or exacerbated any injury."

Accordingly, based on a motion *in limine* brought on the court's own motion, on July 2, 1991, the court issued a final order excluding evidence of personal injury (the exclusion order). The order precluded plaintiffs "from offering any evidence that a hazardous material or toxic waste . . . has caused any physical injury or illness or exacerbated any preexisting injury, illness or physical condition."

Petitioners filed a writ petition seeking an order compelling the court to set aside and vacate the exclusion order. We issued the alternative writ and stayed the trial, which was set to commence on August 5, 1991.

CONTENTIONS

Petitioners raise the following arguments regarding the validity of the exclusion order.

1. There is no authority for the procedure employed by the court.

2. The procedure is unconstitutional as it deprives petitioners of their right to a jury trial by disposing of the action on its merits at a pretrial stage.

3. Petitioners fulfilled the requirements of the order regarding prima facie showings.

4. With respect to the issues of judicial economy and case management expediency, the exclusion order has resulted in an untenable situation in which petitioners will not be permitted to present essential evidence relating to the interconnected physical aspects of their emotional injury claims.

DISCUSSION

I. *As part of a trial court delay reduction program, in a complex litigation case, the trial court has the authority to issue an evidence exclusion order.*

A. *California courts have broad and inherent power to control matters before them.*

Petitioners contend that the trial court had no authority for issuing the subject order, which was essentially a summary judgment motion, as it did not follow summary judgment procedures or any other formal procedures, and that the court exceeded the scope of its inherent and discretionary powers. We do not agree with petitioners' characterization of the order as a summary judgment motion. It is what it says it is—an order excluding evidence. Case law and various statutory provisions give courts broad and inherent powers and serve as the sources for the authority to issue such an order.

According to Code of Civil Procedure section 128, subdivision (a)(8), every court shall have the power to "amend and control its process and orders so as to make them conform to law and justice." Code of Civil Procedure section 187 provides that: "When jurisdiction is, by the Constitution or this Code, or by any other statute, conferred on a Court or judicial

officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this Code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this Code." Government Code section 68070 provides that: "Every court may make rules for its own government . . . not inconsistent with law or with the rules adopted and prescribed by the Judicial Council."

The instant litigation was designated as complex litigation and assigned to a single judge for all purposes. For purposes of complex litigation: "Principal objects of the preliminary pretrial conference are to expose at an early date the essential issues in the litigation and to suppress unnecessary and burdensome discovery procedures in the course of preparing for trial of those issues." (Cal. Standards Jud. Admin., § 19(h).)

■ Furthermore, courts have inherent equity, supervisory and administrative powers (*Bauguess* v. *Paine* (1978) 22 Cal.3d 626, 635 [150 Cal.Rptr. 461, 586 P.2d 942]) as well as inherent power to control litigation before them. (*Western Steel & Ship Repair, Inc.* v. *RMI, Inc.* (1986) 176 Cal.App.3d 1108, 1116-1117 [222 Cal.Rptr. 556].) Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute. (*Walker* v. *Superior Court* (1991) 53 Cal.3d 257, 267 [279 Cal.Rptr. 576, 807 P.2d 418].)

California courts have fashioned new forms of procedures when required to deal with the rights of the parties and to manage the caseload of the court. For example, in *James H.* v. *Superior Court* (1978) 77 Cal.App.3d 169, 175 [143 Cal.Rptr. 398], the Court of Appeal held that the juvenile court had the inherent power to hold a required competency hearing even though the juvenile court law failed to provide for such a proceeding. The court based its holding on the principle that: "Courts have the inherent power to create new forms of procedure in particular pending cases. 'The . . . power arises from necessity where, in the absence of any previously established procedural rule, rights would be lost or the court would be unable to function.' " (*Ibid.*) (See also, *Ellis* v. *Roshei Corp.* (1983) 143 Cal.App.3d 642, 648-649 [192 Cal.Rptr. 57] ["A trial court is empowered to exercise its supervisory power in such a manner as to provide for the orderly conduct of the court's business and to 'guard against inept procedures and unnecessary indulgences which would tend to hinder, hamper or delay the conduct and dispatch of its proceedings.' "]; *Adamson* v. *Superior Court* (1980) 113 Cal.App.3d 505, 509 [169 Cal.Rptr. 866] ["Courts are not powerless to formulate rules of procedure where justice demands it."]; *Santandrea* v. *Siltec Corp.* (1976) 56 Cal.App.3d 525, 529 [128 Cal.Rptr. 629] disapproved on another point in

*Bauguess* v. *Paine, supra,* 22 Cal.3d 626, 639, fn. 8 ["Every court has the inherent power to regulate the proceedings of matters before it and to effect an orderly disposition of the issues presented."]; *Mowrer* v. *Superior Court* (1969) 3 Cal.App.3d 223, 230 [83 Cal.Rptr. 125] ["A court has inherent power to exercise reasonable control over all proceedings connected with the litigation before it."].)

In *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272, 285 [245 Cal.Rptr. 873], the Court of Appeal upheld the trial court's evidence preclusion order for an abuse of the discovery process notwithstanding the absence of a specific statutory authorization. The court reasoned that courts have inherent powers, independent of statute; powers which are derived from the historic power of equity courts and from the court's supervisory and administrative powers. (*Id.,* at p. 287.)

In *Asbestos Claims Facility* v. *Berry & Berry* (1990) 219 Cal.App.3d 9, 23-25 [267 Cal.Rptr. 896], a complex litigation case, the court upheld the trial court's use of its inherent powers to appoint a law firm as a designated defense counsel to perform primarily administrative functions such as scheduling depositions and medical examinations, but required the trial court to monitor the firm's fee requests. The court reasoned that:

"In addition to their inherent equitable power derived from the historic power of equity courts, all courts have inherent supervisory or administrative powers which enable them to carry out their duties, and which exist apart from any statutory authority. 'It is beyond dispute that "Courts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council." ' That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation, including discovery matters, in order to insure the orderly administration of justice. 'Courts are not powerless to formulate rules of procedure where justice demands it.' The Legislature has also recognized the authority of courts to manage their proceedings and to adopt suitable methods of practice." (Citations omitted.) (*Id.,* at p. 19.)

The court also stated that:

"The extent of the trial court's inherent managerial power in complex civil litigation has not yet been delineated by this state's reviewing courts. However, federal courts have long recognized that active and effective judicial management of such litigation is crucial. One federal court has explained, 'Managerial power is not merely desirable. It is a critical necessity. . . . We face the hard necessity that, within proper limits, judges must

be permitted to bring management power to bear upon massive and complex litigation to prevent it from monopolizing the services of the court to the exclusion of other litigants.' " (219 Cal.App.3d at p. 20.)

B. *California courts have broad, discretionary authority to exclude evidence.*

■ Courts have broad authority over the admission of evidence. (3 Witkin, Cal. Evidence (3d ed. 1986) § 1707, p. 1667.) The following relevant Evidence Code sections were cited by the court in its order: 310 (determination of issues of fact preliminary to the admission of evidence), 320 (the power to regulate the order of proof), 352 (exclusion of prejudicial, confusing and unduly time-consuming evidence) and 402, subdivision (b) (preliminary determination regarding admissibility of evidence).

C. *The Ventura County trial reduction program empowers the court to exclude unmeritorious claims.*

■ Under the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.), designated counties, including Ventura County where this action is venued, have been given wide latitude in developing their own rules and procedures to reduce litigation delays that have reached "scandalous proportions" in some counties. (*Laborers' Internat. Union of North America* v. *El Dorado Landscape Co.* (1989) 208 Cal.App.3d 993, 1001 [256 Cal.Rptr. 632].)

Superior Court of Ventura County, local court rule 3.01 provides that:

"A. PURPOSE, INTENT. The goals of judicial process being the determination of facts and applicable law in each case and the rendering of court disposition with finality and without undue delay, the intent of this court is to accept responsibility for, monitor and require timely preparation of all phases of litigation in all cases filed in the court, from the date of filing to the date of disposition. To this end, the court will require full disclosure of all pertinent facts between parties to actions at the earliest possible time, and frank discussion of potential agreement and resolution of contested issues, to every extent permitted by law. It is further intended that the predictability of the outcome of court proceedings will thus be enhanced, in the interest of increased recognition and mutual acceptance of just results; and with reduced reliance on delay, concealment, surprise, and other elements of legal strategy that make no legitimate contribution to the ends of justice.

"B. TRIAL ASSIGNMENT, EXPEDITION. The public resources of the court system are limited, and must be reserved for those cases that truly must have

contested trials, which have historically been a small percentage of all cases filed with the court. Likewise, trial judge and courtroom resources must be efficiently used, and unnecessary delay in the trial process itself must be eliminated. To this end, parties and counsel shall be prepared to proceed promptly to trial when court resources are available for trial. Following commencement of a trial, the trial shall proceed without undue delay and in the minimum time necessary for a fair trial."

"The management of the trial court's delay reduction program is an area within the court's discretion and will not be disturbed unless it appears that the exercise of the discretion was a clear abuse or a miscarriage of justice." (*Youngworth* v. *Stark* (1991) 232 Cal.App.3d 395, 401 [283 Cal.Rptr. 668].) "Guiding the disposition of this issue are two competing policies: (1) the reduction of delay in litigation and the expeditious and timely resolution of cases, and (2) the resolution of cases on their merits rather than dismissal on procedural grounds." (*Ibid.*)

█ In view of all these authorities, most of which were relied upon by the trial court, it is apparent that courts have the power to fashion a new procedure in a complex litigation case to manage and control the case before them. Although it is not possible to set forth precise guidelines as to when such an order can be issued or what other kinds of procedure can be used, we conclude that a court should consider the totality of the circumstances of the particular case in deciding how to manage a complex litigation case.

█ In the instant case, the timing of the order is crucial to its legitimacy. The order was issued on July 2, 1991, and the trial was set to commence on August 5, 1991. Thus, the final order was made on the eve of trial, apparently at a time after petitioners had submitted their lists of designated experts.[3] Had the order been made earlier in the proceedings, we would be more inclined to hold that the order was an abuse of the court's discretion.

Moreover, it has been estimated that the trial will be an extraordinarily lengthy one. Although in April 1991, petitioners stated that the trial would last approximately one year, the writ petition refers to a two-year trial or a trial lasting more than one year.

---

[3] According to the case management order, that date was after the designation of experts. However, since this matter is before us by way of a writ petition, we do not have the entire record before us. Petitioners' list of experts is part of the record. Although petitioners objected to the nonsimultaneous designation of experts and a clarification order allowed more time to depose experts, there appears to be no revision of the time limit by which petitioners had to designate their experts.

Although most of the cases cited herein involve different kinds of use of the court's inherent powers, *Peat, Marwick* also involved an evidence preclusion or exclusion order even though the order was founded upon a different basis—an abuse of the discovery process. In *Peat, Marwick,* the court opined that inherent powers should be "flexibly applied in response to the many vagaries of the litigation process." (*Peat, Marwick, Mitchell & Co. v. Superior Court, supra,* 200 Cal.App.3d 272, 287.) The court stated that motions *in limine* were an example of the court's inherent power and noted that the scope of such motions is " 'any kind of evidence which could be objected to at trial, either as irrelevant or subject to discretionary exclusion as unduly prejudicial.' " (*Id.,* p. 288.)

We conclude that Judge Johnson properly used the court's inherent powers to manage the complex litigation case before her and hold that in a complex litigation case which has been assigned to a judge for all purposes, a court may order the exclusion of evidence if the plaintiffs are unable to establish a prima facie claim prior to the start of trial.

Having discussed the general appropriateness of the court's actions and order, we now turn to a discussion of the issues of whether the procedures used to arrive at the instant order violated petitioners' due process rights or their right to a jury trial and whether petitioners made a prima facie showing of personal injury.

II. *The instant exclusion order was valid.*

A. *History of the instant order.*

In April 1989, in response to a master set of interrogatories, petitioners responded that they could not "identify any injuries caused by exposure to chemical substances. However, plaintiff reserves all rights to assert claims for such injuries as more information becomes available."

Accompanying the proposed case management order was a declaration in which counsel stated that: "According to their deposition testimony, none of the deposed plaintiffs have been examined by a medical expert to determine whether their physical complaints have any relation to exposure to chemical substances alleged to be present at the Dunes subdivision." In requesting the case management order, defendants also noted the "evasive" responses to discovery and the existence of DOHS testing.

Thus, petitioners failed in discovery to disclose any information pertaining to their physical injury claims.

Accordingly, in the November 7, 1990, case management order, the court ordered that each plaintiff file a statement establishing a prima facie claim, specifically ordering that: "each plaintiff shall state the chemical or toxic substance to which that plaintiff was exposed; the date or dates and place of exposure; the method of exposure; the nature of plaintiff's injuries; and the identity of each medical expert who shall support the plaintiff's personal injury claim."

Both groups of plaintiffs submitted statements of personal injury and property damages on January 7, 1991. In their respective uniform statements, both groups of plaintiffs essentially stated that they could not link a specific illness to a specific chemical and admitted that none of the plaintiffs had been diagnosed as having any illness or injury caused by exposure to the chemicals.

On March 4, 1991, the court held a hearing on a defense motion to dismiss all plaintiffs' personal injury, emotional distress and property damages claims for failure to make the court-ordered prima facie showing. During oral argument, one defense counsel noted that the statements did not say "it's more likely than not" or "that it's within a reasonable medical certainty that plaintiffs' injuries have been caused by exposure."

After oral argument, the court found that plaintiffs had established their prima facie cases regarding their emotional distress and property damages claims, but not their physical injury claims.

In addition to plaintiffs' having admitted that no plaintiff had been diagnosed as having a physical injury or illness caused by exposure, the DOHS preliminary report stated that the chemicals at the Dunes did not pose a significant threat to the health of the residents.

Thereafter, there was a defense motion to dismiss certain causes of action. In the motion, defendants noted that in the uniform statements causation was cast in terms of "may." The court tentatively ordered the exclusion of "all evidence, by lay or expert witnesses, that plaintiffs have or will suffer any particular injury or illness based on exposure to toxic substances in the Dunes" unless plaintiffs could demonstrate by May 31, 1991, that viable claims for personal injury existed.

Petitioners did not object to, or seek appellate review of, the requirement of making a prima facie showing of personal injury either at the time the case management order was issued or when supplemental statements were requested by the court.

At the April 10, 1991, hearing on the related matter of delaying the independent medical examinations of the plaintiffs, counsel for petitioners raised the issue of the contemplated supplemental statements. The court advised counsel that it was the court's hope to "actually widdle [*sic*] down specific physical illnesses or conditions or injuries that *some medical person could testify to the appropriate medical degree* [were] related to the toxics." (Italics added.)

Plaintiffs filed supplemental statements, and the court held a hearing on June 27, 1991, on a motion to issue a final order excluding all plaintiffs' personal physical injury claims. The court determined that plaintiffs still were unable to demonstrate with reasonable or probable medical certainty the existence of a single physical injury caused by exposure at the Dunes. Afterwards, based on the court's own motion *in limine*, the court issued the final order excluding evidence "that a hazardous material or toxic waste . . . has caused any physical injury or illness or exacerbated any preexisting injury, illness or physical condition."

In the order, the court cited its inherent power to manage complex litigation in accordance with the *Asbestos Claims* and *Peat, Marwick* cases as well as its "sua sponte ability to preclude evidence upon an appropriate showing or lack of showing" in accordance with the Evidence Code. In its order, the court stated that:

"The court finds that there is substantial legal justification for a pretrial order of this nature. This case has been designated as complex litigation pursuant to section 19 of the Judicial Administrative Standards. Section (g)(4) encourages the court to consider—and presumably make rulings on—protective orders. The Fifth Amended Dolan Complaint and Fourth Amended Cottle Complaint raised questions regarding plaintiffs' ability to make a prima facie showing regarding their personal injury claims (i.e. that a certain substance or combination of substances caused, to a reasonable medical certainty some disease or personal injury to a plaintiff, or exacerbated some preexisting condition). The Case Management Order of November 7, 1990, was intended to determine if the personal injury claims, or any other cause of action, should be the subject of trial testimony. Since the plaintiffs have acknowledged they have no treating physician, medical doctor, or qualified medical expert who can testify as to causation, any evidence regarding plaintiffs' personal injury claims would confuse the jury, require the defense to respond unnecessarily, and elongate this trial."

B. *Petitioners were not deprived of due process or the right to a jury trial.*

Petitioners claim that the court's review of their prima facie showings comprised a moving target that at various times appeared to be a

protective order proceeding, a motion on the pleadings proceeding, a summary judgment proceeding, a motion *in limine* proceeding and/or a housekeeping proceeding and that by moving the target or not making plain the type of proceeding that was underway, the governing standard and the legal basis for such standard were not clear. Furthermore, petitioners question the use of the reasonable medical probability standard at the pretrial stage and placing the burden of going forward on them.

We disagree with petitioners' characterization of the court's actions. Rather, we conclude that the court merely reacted to petitioners' inability to establish a prima facie case of physical injury by their having admitted that so far none of them had been diagnosed as having an injury caused by exposure. We note that the court read both the initial and supplemental statements and twice listened to extensive argument on the issue of a prima facie showing of physical injury.

Although given the caldron of chemicals present at the Dunes, the initial order of the court may have been too demanding in asking the plaintiffs to make linkages between the specific chemicals, exposure and specific illnesses or injuries, the court did permit the plaintiffs to submit supplemental statements and later clarified that it wanted a synergistic cause and effect linkage between exposure and symptoms.

To the extent that petitioners' claim that the court moved the target can be interpreted as a claim that the court violated their right to due process, we disagree with such a claim. Even though the nature of the proceedings in the court changed, it was clear that what the court wanted was for petitioners to make a prima facie showing of their physical injury claims. Accordingly, petitioners had notice of what was actually required of them as well as extensive opportunity to present evidence and argue the issue.

C. *A prima facie claim of physical injury or illness requires a showing of a degree of reasonable medical probability based upon competent expert evidence.*

██ "The law is well settled that in a personal injury action causation must be *proven within a reasonable medical probability based upon competent expert testimony*. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its

action. This is the outer limit of inference upon which an issue may be submitted to the jury." (Italics added.) (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403 [209 Cal.Rptr. 456].)

 Petitioners argue that the court performed major surgery on their claims and unconstitutionally deprived them of their right to a jury trial in that it made factual determinations which should have been resolved by the designated fact finder. (*Olivia N.* v. *National Broadcasting Co.* (1977) 74 Cal.App.3d 383, 389 [141 Cal.Rptr. 511].)

Petitioners insist that causation in the context of an extremely complex case such as this one is not a black and white issue and that the court made factual determinations going to the weight of the evidence since there were doubtless concurrent causes at work with respect to their various medical conditions. They argue that a single expert witness would not be capable of opining on every aspect of causation, but instead experts would offer testimony on one aspect or another of the causation issues and that with concurrent causes, the burden of proving causation would shift to defendants at trial. (*Summers* v. *Tice* (1948) 33 Cal.2d 80, 86-88 [199 P.2d 1, 5 A.L.R.2d 91].) Petitioners infer that the jury could determine causation from the totality of the circumstances, making causation a triable issue.

In order to recover damages for physical injury, petitioners would need to introduce evidence that to a degree of reasonable medical probability, their injuries had been caused by exposure to chemicals. Certainly, early in the proceedings, it would have been unreasonable to expect petitioners to make such a connection prior to conducting discovery, but on the eve of trial, requiring such a showing is not unreasonable.

 In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation. Had petitioners presented evidence that the chemicals in the ground at the Dunes were in some degree a cause of petitioners' physical injuries to a degree of reasonable medical probability, then there would have been a factual question for the jury to resolve.

However, it is the lack of such evidence that led to the exclusion order. As will be discussed in the next section, since we agree with the court's finding that petitioners did not present a prima facie showing of physical injury, we disagree with petitioners' claim that they presented substantial evidence of causation.

D. *There was no evidence of causation to a degree of reasonable medical probability.*

 Petitioners argue that although not using the magic words, the declaration of Dr. Greenberg, which tied exposure to specific chemicals to specific ailments suffered by specific plaintiffs as required by the court, fulfills the burden of establishing reasonable medical probability as it placed defendants on notice of petitioners' physical injury claims and that the declarations of Drs. Ellenberg, Schaeffer, and Broughton support the causation evidence. However, the issue here is not notice, but a showing of a prima facie claim of physical injury. Petitioners conclude that for the court to have reached the conclusion that no medical evidence of causation was presented, the court would have had to ignore the record before it. We disagree.

With one exception, Dr. Broughton did not make any statement that exposure to the chemicals in the Dunes had caused any injury to any of the petitioners to a degree of reasonable probability. In fact, Dr. Broughton stated that because of the mixed nature of the chemicals at the Dunes: "it is impossible to assign *specific* chemicals has [*sic*] having caused *specific* conditions to *specific* individuals." (Original italics.)

Dr. Broughton did not opine that any petitioner had a physical injury caused by exposure, rather it was his opinion that: "Because of the nature of the identified chemicals, their volume, and their documented caustic and toxic effects, . . . based upon reasonable scientific and medical certainty, that exposure to these chemicals, alone and in combination, has placed these people at significantly increased risk to develop a number of diseases"[4]; and "the changes exhibited by the group are in all probability related to living in close proximity to chemicals in the environment." However, the latter statement does not tie the changes to the chemicals at the Dunes as separate from other chemicals in the environment and the changes referred to are those indicating an increased probability of infection (i.e., an increased risk of developing a number of diseases). This aspect we discuss in more detail below.

It appears that for the first time on appeal, the Oxnard Shores defendants impliedly object to the declarations of Drs. Greenberg, Ellenberg, and Schaeffer as being inadmissible and incompetent evidence since, among

---

[4]As part of the Dolan plaintiffs supplemental statement, Drs. Sherman and Greenberg reached the same conclusion regarding plaintiffs' increased risk.

other reasons, they are not medical doctors.[5] ■ The record before us does not show that these objections were raised in the trial court, and evidentiary objections cannot be raised for the first time on appeal. (*People v. Robinson* (1965) 62 Cal.2d 889, 894 [44 Cal.Rptr. 762, 402 P.2d 834].) Furthermore, some courts have suggested that in toxic tort cases, causation need not be established by a medical doctor and might in fact be established by a toxicologist. (E.g., *In re Paoli R.R. Yard PCB Litigation* (3d Cir. 1990) 916 F.2d 829, 855-856.)

■ We need not reach the issue of whether or not only a medical doctor can testify to causation of physical injuries in a toxic tort case, since assuming arguendo that these declarations are admissible, they still do not establish causation to the requisite degree.

Although Dr. Greenberg makes statements regarding the medical condition of 12 petitioners, the most he says is that their medical condition "could possibly be partially due to and/or exacerbated by continuous exposure" or "could possibly be [or have been] exacerbated by continuous exposure" to chemical substances. As stated in *Jones,* such statements of possibility instead of probability are not sufficient to prove causation.

Dr. Ellenberg makes a general statement that all four of the male children born at the Dunes suffer from various disabilities related to toxic exposure. Her statements that similar problems "have been associated with," "could be directly related to effects of," "may occur in children as a result of," and "may be related to" exposure do not establish causation to a degree of reasonable medical probability. Finally, Dr. Schaeffer does not express an opinion with respect to any petitioner's physical, as opposed to emotional, condition and exposure.

The court indicated that it did not think that it had made any factfinding decision or done any weighing of facts, but had taken the plaintiffs' showing as 100 percent true and that it thought that after hearing plaintiffs' witnesses, it would have granted a motion for nonsuit. The court stated that it made its decision based on its need to manage the case efficiently and effectively. Rather than taking up the jury's time hearing testimony on the issue of physical injuries caused by toxins, the court properly sought to avoid confusion and preserve time.

Although we agree that it is important to preserve the right to a jury trial and not to sacrifice fairness and justice for the sake of convenience and

---

[5]The McGrath defendants noted that these doctors were not medical doctors, but did not object to their statements on that basis.

efficiency, we are convinced that did not happen here. In our opinion, the court did not deal a drastic blow to petitioners' claims or dispose of those claims on the merits; what the court eliminated was essentially a nonexistent claim, as causation must be established by expert testimony, testimony to a degree of reasonable medical probability.

## III. *Clarification.*

While an order excluding evidence for the failure to make a prima facie showing is proper in a complex litigation case so that the court can manage and control the case, we give no opinion on such an order in any other context. Our holding is limited to complex litigation cases.

Petitioners contend that they will not be permitted to present evidence of the physical aspect of their emotional injuries. That contention is contrary to the court's ruling. The exclusion order only precludes them "from offering any evidence that a hazardous material or toxic waste . . . has caused any physical injury or illness or exacerbated any preexisting injury, illness or physical condition." The order does not preclude evidence of physical injury caused by emotional distress as opposed to physical injury caused by exposure to chemicals.

Furthermore, in the tentative order, the court stated that: "This [ruling] is not intended in any way to preclude plaintiffs from testifying or presenting evidence regarding any emotional distress damages which they claim as a result of exposure and or residence in the Dunes. Although the court is aware that the leading case has been granted review and is no longer the substantive law in California, for purposes of what evidence will be allowed in at trial, the court will continue to apply the *Potter* v. *Firestone* [*Tire & Rubber Co.* (1990) 232 Cal.App.3d 1114 (274 Cal.Rptr. 885)] standard."[6]

We note that one federal circuit court observed that: "[I]n an effort to accommodate a society with an increasing awareness of the danger and potential injury caused by the widespread use of toxic substances, courts have begun to recognize claims like medical monitoring, which can allow plaintiffs some relief even absent present manifestations of physical injury. More specifically, in the toxic tort context, courts have allowed plaintiffs to recover for emotional distress suffered because of the fear of contacting a toxic exposure disease [citation], the increased risk of future harm [citation],

---

[6]Review of *Potter* v. *Firestone Tire & Rubber* (1990) 232 Cal.App.3d 1114 [274 Cal.Rptr. 885] was granted on February 28, 1991 (S018831). Under the *Potter* decision, the appellate court upheld the award of emotional distress damages for the plaintiffs' fear of developing cancer.

and the reasonable costs of medical monitoring or surveillance [citations]." (Fns. omitted.) (*In re Paoli R.R. Yard PCB Litigation, supra,* 916 F.2d 829, 850.)

We have not been asked to address whether or not any of these torts are cognizable in California, and we express no views on them. As already noted, petitioners did present expert evidence regarding the increased risk of future harm to the requisite degree of reasonable medical probability.

In the interim, perhaps the Supreme Court or the Legislature will address the issue and provide guidance to trial courts as to whether increased risk is cognizable in toxic tort cases in California.

### DISPOSITION

The alternative writ is discharged, the stay issued herein on August 1, 1991, is vacated, and the petition for a writ of mandate is denied. The July 2, 1991, order of the court excluding petitioners from introducing evidence that their physical injuries were caused by exposure to hazardous material or toxic waste at the Dunes is affirmed as expressed in the views in this opinion. Real parties in interest to recover costs on appeal.

Lillie, P. J., concurred.

**JOHNSON, J.,** Dissenting.—I do not adopt the majority's broad analysis of a trial court's inherent powers especially when the court's action deprives litigants of procedural protections the Legislature guaranteed. Moreover, while I recognize trial courts are granted special powers when handling complex civil litigation, the applicable California standards do not confer authority to terminate causes of action for lack of proof before trial without complying with the summary judgment procedure the Legislature specifically enacted for that purpose. Furthermore, assuming the trial court's decision was procedurally permissible, I disagree with the causation standard the majority opinion approves for use in this toxic tort case.

I. *The Case Management Order Denying Plaintiffs the Opportunity to Present Their Personal Injury Actions to the Jury Is the Functional Equivalent of a Summary Judgment Motion Granted Without Complying With the Procedural Protections Mandated by the Legislature and Cannot Be Justified Under the "Inherent Powers" of the Court or Under the Special Standards Applicable to Complex Litigation.*

I have serious differences with my colleagues over the procedural legality of the trial court's "case management order" barring plaintiffs from introducing *any* evidence to support their personal injury causes of action. I am

particularly concerned by the majority's holding this sort of order is within a trial court's ordinary "inherent powers" and thus presumably available in any case. However, it is necessary to state a caveat.

Language in the trial court's own order suggests it considered this "case management order" justifiable as an *in limine* evidentiary ruling not an exercise of its "inherent powers" or some special power it enjoyed because this was a complex case. Nothing in this dissent should be construed as arguing it would have been impermissible *in procedural terms* for the trial court to have issued an *in limine* evidentiary order excluding the evidence the plaintiff tendered pursuant to this case management order on grounds this particular evidence was irrelevant (Evid. Code, § 351) or less probative than prejudicial (Evid. Code, § 352) or for some other reason *inadmissible*. It is because the trial court's order went several steps further and barred the plaintiffs from introducing *any* evidence as to their personal injury causes of action that it fails to qualify as a legitimate *in limine* evidentiary order.

Nothing in the Evidence Code or otherwise authorizes a trial court to terminate a cause of action *in limine* by excluding *any and all* evidence that might be offered to prove that cause of action. It is beyond the scope of an *evidentiary* ruling to order a party to refrain from presenting *any* evidence— not just the evidence the court found insufficient or inadmissible—tending to prove an entire cause of action. To deny a party the right to present evidence to a jury in support of a cause of action is the very same thing as an order terminating that claim. A *termination* order, in turn, requires compliance with the procedural rules governing dismissal of a cause of action for insufficiency of the evidence—summary judgment before trial or nonsuit or directed verdict during trial.

If the trial court's order had been conditional or limited—excluding the particular evidence the plaintiffs tendered but allowing them to introduce different or additional evidence to prove their personal injury claims at trial—it could have qualified as an *in limine* evidentiary determination. But it was neither conditional nor limited to the particular evidence before the court. Instead it focused on causes of action, not specific pieces of evidence. Thus, the trial court's order was not an *in limine* evidentiary ruling; it was a summary judgment granted without affording plaintiffs the procedural protections the Legislature has guaranteed before such a drastic action can be taken.

A. *The Order Terminating Plaintiffs' Personal Injury Causes of Action Cannot Be Justified as an Exercise of the Court's "Inherent Powers."*

As noted in the majority opinion, there is no express statutory provision authorizing mandatory pretrial disclosure of the factual bases supporting a

plaintiff's cause of action. (See, e.g., Code Civ. Proc., §§ 128, 177, 187.) Nor has the Judicial Council promulgated rules or guidelines specifically endorsing such broad authority for a trial court. (See Cal. Standards Jud. Admin.) Even more clearly, there is no authority in the statutes or the rules to terminate a plaintiff's cause of action by denying him or her the opportunity to prove that cause of action because the trial court decides the evidence offered in response to the disclosure order is inadequate to prove a prima facie case.

The majority opinion instead justifies the procedure employed in this case as a proper exercise of a trial court's inherent administrative and supervisory powers. There is little doubt "When jurisdiction is, by the constitution or this code, or by any other statute, conferred on a court or judicial officer, all the means necessary to carry it into effect are also given; and in the exercise of this jurisdiction, if the course of proceeding be not specifically pointed out by this code or the statute, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code." (Code Civ. Proc., § 187.) Thus, under the authority of this section and similar provisions in the Code of Civil Procedure (§ 128, subd. (a), § 177), courts have devised various procedural rules to fairly and expeditiously handle litigation before them which presented procedural problems not otherwise covered in the statutes or rules.

However, appellate decisions construing these provisions indicate resort to a trial court's inherent authority to craft new rules of civil procedure is only a proper exercise of inherent powers when made necessary because of the *absence* of any statute or rule governing the situation. Thus, the rationale for devising new rules of procedure has historically been one of necessity. In other words, to fill a void in the statutory scheme, a court had a duty to create a new rule of procedure in the interests of justice and in order to exercise its jurisdiction. However, unlike the "procedure" employed in the case at bar, none of the judicially created procedures involved a ruling to decide the merits of a cause of action and, on that basis, to remove that cause of action from jury consideration. (See, e.g., *People* v. *Jordan* (1884) 65 Cal. 644 [4 P. 683] [in absence of legislative directive court must adopt rules for appellate review of a judgment of conviction]; *Addison* v. *State of California* (1978) 21 Cal.3d 313 [146 Cal.Rptr. 224, 578 P.2d 941] [justice required courts to develop the procedural rule of equitable tolling of statutes of limitation]; *Citizens Utilities Co.* v. *Superior Court* (1963) 59 Cal.2d 805 [31 Cal.Rptr. 316, 382 P.2d 356] [to prevent injustice court has inherent power to deviate from statute to value condemned property date of transfer so as to include government imposed betterments pendente lite]; *Peat, Marwick, Mitchell & Co.* v. *Superior Court* (1988) 200 Cal.App.3d 272 [245 Cal.Rptr.

873] [evidence preclusion on some elements of a cause of action as sanction for ethical abuses undermining plaintiff's case and integrity of the judicial system]; *Asbestos Claims Facility* v. *Berry & Berry* (1990) 219 Cal.App.3d 9 [267 Cal.Rptr. 896] [within inherent power of trial court in complex civil litigation to appoint law firm to coordinate discovery]; *Western Steel & Ship Repair, Inc.* v. *RMI, Inc.* (1986) 176 Cal.App.3d 1108 [222 Cal.Rptr. 556] [within court's inherent power to shorten time on debtor's noticed motion to quash a writ of attachment]; *James H.* v. *Superior Court* (1978) 77 Cal.App.3d 169 [143 Cal.Rptr. 398] [although not expressly authorized, due process demands juvenile have right to competency hearing to ensure he can cooperate with counsel in his defense in order to preserve juvenile's Sixth Amendment right to counsel]; *Adamson* v. *Superior Court* (1980) 113 Cal.App.3d 505 [169 Cal.Rptr. 866] [although no provision for rehearing after trial de novo from small claims court, within court's inherent power to correct mistakes of law or fact on rehearing as process more efficient and economical than appeal to Court of Appeal and furthers purpose of small claims statutes]; *Mowrer* v. *Superior Court* (1969) 3 Cal.App.3d 223 [83 Cal.Rptr. 125] [court has inherent authority to control courtroom but not private members of the bar by blanket order requiring presence until and unless excused]; *Clemens* v. *American Warranty Corp.* (1987) 193 Cal.App.3d 444 [238 Cal.Rptr. 339] [courts have inherent power to entertain motions *in limine* but not to rule on an unnoticed motion for judgment on the pleadings at the same hearing].)

Certainly no reported decision invoked the trial court's inherent authority to change or deviate from the established rules and legislative guidelines except to prevent a gross injustice. (See, e.g., *Citizens Utilities Co.* v. *Superior Court, supra,* 59 Cal.2d 805 [to account for mandatory betterments, fairer to value property for condemnation at time of trial].)

In the instant case, there was no statutory void which required the court's "inherent power" to fill. To the contrary, the trial court's case management order was the substantial equivalent of a mechanism the Legislature has long provided—the motion for summary judgment. The Legislature, however, has surrounded this mechanism with procedural protections it considers essential to fairness and justice. These procedural protections were not afforded plaintiffs in this case.

Plaintiffs were ordered to present evidence of physical injury from exposure to the toxic substances through medical records, physician affidavits and the like. When the trial court deemed this evidence insufficient it terminated plaintiffs' causes of action, preventing them from being considered by the jury. As a consequence, the case management order in this case

changed the legislatively established procedure of Code of Civil Procedure section 437c. Had the procedural guidelines for summary judgment been followed, the defendants would have had to have initiated the process and have supplied evidence causation could *not* be proved. Strictly construing these moving papers and liberally construing plaintiffs' documents in opposition to the motion, the court would have then decided whether there remained any triable issues of material fact as to causation. (*Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 626-627 [193 Cal.Rptr. 600]; *AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) However, the trial court here did not employ the statutory provision for summary judgment with its built-in procedural safeguards. In its place the trial court substituted a bastardized process which had the purpose and effect of summary judgment but avoided the very procedures and protections the Legislature deemed essential.

The Legislature has provided a pretrial procedure for terminating a cause of action because the plaintiff has insufficient evidence to warrant a jury trial of the claim. That procedure is summary judgment. Consequently, trial courts lack "inherent power" to do the same thing under another name, especially one which omits vital procedural protections the Legislature guaranteed in its summary judgment statute. This attempt to grant the functional equivalent of a summary judgment in the guise of a case management order impinges on a litigant's constitutional right to have material issues of fact decided by a jury without affording the procedural protections the Legislature deemed essential before this drastic step would be allowed.

An appellate court would reverse a summary judgment if the trial court considering the summary judgment motion failed to adhere to essential requirements of that statutory procedure. The result should be no different where the court omits those statutory steps entirely by calling an action effectively granting summary judgment a case management order or something else.

If this "quasi-summary judgment" procedure is permissible under the "inherent power" of the courts, the courts will be free in all cases to interpose this further hurdle between plaintiffs and a jury trial of their claims. In any case and without affording them the protections of a summary judgment motion, any trial court could order plaintiffs to submit prima facie proof of their causes of action then deny them the opportunity to present any or all of those claims to the jury if the court deemed the evidence insufficient. This is yet another reason for questioning the majority's justification of the trial court's action in this case as within the general "inherent powers" of the courts.

B. *The Case Management Order Terminating Plaintiffs' Personal Injury Causes of Action Is Not Authorized by the Standards of Judicial Administration Governing Complex Cases.*

The closer question in this case is whether the trial court's order can be justified as an exception authorized under the special procedures applicable to complex civil litigation.

Section 19 of the California Standards of Judicial Administration sets forth the Judicial Council's intent to confer great flexibility in the handling of complex litigation. The standards suggest the trial court "actively" and "continuously" manage these cases. Although there is no express provision requiring *disclosure* of the factual basis for the causes of action, as opposed to *discovery* of relevant factual underpinnings, arguably this procedure is comprehended within this provision's directive to "minimize evidentiary disputes" and "expose at an early date the essential issues in the litigation." The peculiar exigencies of complex litigation may indeed necessitate early disclosure of evidence due to the great number of litigants, issues and discovery generally involved in mass litigation. However, the same justifications cannot be advanced to justify taking causes of action from the jury before trial without complying with the summary judgment procedure.

The Judicial Council Advisory Committee on Complex Litigation relied extensively on a report issued by the National Commission for the Review of Antitrust Laws and Procedures. California's advisory committee adopted some of the federal report's recommendations expressly and incorporated others into the general terms of section 19 of the California Standards of Judicial Administration.

For example, section 19(a) provides: "In complex litigation, judicial management should begin early and be applied continuously and actively, based on knowledge of the circumstances of each case." The Advisory Committee Comment to that section states: "In the course of its deliberations, the Judicial Council Advisory Committee on Complex Litigation made frequent reference to the Report to the President and the Attorney General made by the National Commission for the Review of Antitrust Laws and Procedures, (January 22, 1979). Proposed standard number 19(a) is taken from the commission's recommendation number one of chapter one, 'Judicial Management and Control.' Placing this provision at the head of the proposed standards gives emphasis to the point that the court should assume an aggressive role at the earliest possible time to efficiently move the case to settlement or trial." (Standards of Jud. Admin., § 19(a), Advisory Committee com.)

Section 19 (g) recommends preliminary pretrial conferences and suggests various areas which might be covered in such a conference, e.g., "Settlement

of the pleadings" or "Schedule discovery proceedings." Section 19(h) states the "[p]rincipal objects of the preliminary pretrial conference are to expose at an early date the essential issues in the litigation and to suppress unnecessary and burdensome discovery procedures in the course of preparing for trial of those issues." The committee comment to this crucial section (among others) is verbatim the language of the recommendations found in the National Report on Antitrust Laws: "The commission had this to say about the two points raised by this recommended standard. As to methods for early focusing and resolution of issues, it wrote: 'Procedures for early and continuous issue-focusing, including *non-binding* statements of fact and contentions of law, should be used aggressively in complex litigation.' [Italics added.] [¶] As to control of discovery its remarks were: 'Courts handling complex cases should exercise effective, direct control over the discovery process. They should balance the burdensomeness of particular discovery activity against its materiality and reduce discovery of tangential, immaterial matters.' " (Standards. Jud. Admin., § 19(h), Advisory Committee com.)

Unfortunately, the clarifying comments of the advisory committee are as generalized as the standards themselves and provide little guidance regarding the precise parameters of a trial court's authority and control over complex litigation.])

On the other hand, the report of the National Commission for the Review of Antitrust Laws and Procedures—from which the Standards of Judicial Administration were taken—includes a comprehensive discussion and analysis of the actual procedures envisioned to carry out its recommendations. The recommendations and commentary included in the National Commission's report are directly relevant to determine the intended scope and breadth of a trial court's power of control of litigation and discovery under California Standards of Judicial Administration section 19 because of the Judicial Advisory Committee's reliance on the report in developing these standards. (See also Judicial Council of Cal., Ann. Rep. (1983) pt. II, ch. C, p. 66. ["Several of the new standards are based on existing rules or guidelines that have been tried successfully in various jurisdictions."])

The methods of issue definition recommended in the report include regular exchange of progressively more specific statements of factual and legal positions and proof; stipulations; requests for admissions; written submissions which concisely state material facts, points of law and abandoned issues; judicial notice; interlocutory appeals of controlling legal issues; and partial or summary adjudication. Although extensive use of the summary judgment procedure was suggested in complex litigation, the commission

warned "We caution, however, that summary disposition must be employed judiciously, and not as a means for bypassing trial or as an excuse for staying other pretrial activity." (Nat. Com. Rep. on Antitrust Laws and Procedures (1979) p. 68.)

Finally, the commission recommended judicial authority to unilaterally define issues where litigants have failed to use reasonable efforts to agree. (Nat. Com. Rep. on Antitrust Laws and Procedures, *supra*, at pp. 62-64.) The report recommended amendment of Federal Rule of Civil Procedure, rule 16 to specifically grant this authority to a trial court. The commission was careful to point out, however, a trial court's authority to define issues in this limited circumstance should not be used as a vehicle to eliminate issues in the guise of narrowing issues. The commission specifically warned: "Such an amendment is *not intended to become an alternate form of summary judgment.*" (Nat. Com. Rep. on Antitrust Laws and Procedures, *supra*, at p. 64, italics added.)

Thus, the report, on which California's Standards of Judicial Administration were based, expressly denounces any form of court intervention in pretrial activities which operates to exclude issues. As noted in the national commission's report, the more appropriate method to eliminate meritless claims or defenses is for the trial court to encourage the parties to bring their own motions for summary judgment. (Nat. Com. Rep. on Antitrust Laws and Procedures, *supra*, at pp. 68-69.)

Because the Judicial Council relied on, and adopted much of, this report in formulating the Standards of Judicial Administration, it is reasonable to assume it was aware of the commission's recommendations and limitations on judicial authority. It would thus appear it did not intend for the general provisions of section 19 of the Standards of Judicial Administration to include authority for the trial court to issue a case management order which operated to summarily adjudicate issues in the absence of a formally noticed motion for summary judgment. As a result, authority for this type of case management order should not be read into the Standards of Judicial Administration.

Nor can I imagine the Judicial Council in adopting section 19 of the Standards of Judicial Administration intended to implement a procedure directly contrary to the legislative judgment expressed in Code of Civil Procedure 437c providing the methods for summary adjudication of issues. That section expresses the collective view of our Legislature that the burden of proving the meritlessness of an opponent's claim or defense is on the party seeking to summarily adjudicate the issue. (Code Civ. Proc., § 437c; see, e.g., *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 49-50

[46 Cal.Rptr. 552] ["While the language of section 437c . . . superficially might seem to cast correlative burdens upon both parties, there is no obligation on the opposing party (plaintiffs here) to establish anything by affidavit unless and until the moving party (defendant here) has by affidavit stated facts establishing *every element* necessary to sustain a judgment in his favor [Citation.] That means a defendant must show clearly that plaintiff's action has no merit. Summary judgments cannot be granted by default [citation]. . . . The burden is upon defendant to rule out *all possible merit* and, as shown above, the law is exacting in its requirements upon a defendant who seeks to meet that burden." Italics in original, internal quotation marks omitted.]; *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 111 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] ["A defendant who moves for a summary judgment must prevail on the basis of his own affidavits and admissions made by the plaintiff, and unless the defendant's showing is sufficient, there is no burden on the plaintiff to file affidavits showing he has a cause of action or to even file counteraffidavits at all. A summary judgment for defendant has been held improper where his affidavits were conclusionary and did not show that he was entitled to judgment and where the plaintiff did not file any counteraffidavits. [Citations.]"]; accord *Bell* v. *Industrial Vangas, Inc.* (1981) 30 Cal.3d 268, 271 [179 Cal.Rptr. 30, 637 P.2d 266].)

As further interpreted by our high court, proof required of a party opposing a motion for summary judgment is liberally construed and those of the moving party strictly construed. Any "doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts." (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; see also *Albermont Petroleum, Ltd.* v. *Cunningham* (1960) 186 Cal.App.2d 84, 92 [9 Cal.Rptr. 405] ["Because of the unusual and drastic nature of the remedy and the importance of safeguarding the adverse party's right to a trial, the summary judgment procedure 'should be used with caution in order that it may not become a substitute for existing methods in the determination of issues of fact.' "], citing *Eagle Oil & Ref. Co.* v. *Prentice* (1942) 19 Cal.2d 553, 556 [122 P.2d 264].)

Indeed, the constitutionality of Code of Civil Procedure section 437c has been upheld against attacks of denial of due process and of the right to jury trial in part because of the procedure's purpose of determining whether there is an issue to be tried by a jury or otherwise, and by placing the burden of proving there are no issues to be tried on the party seeking to avoid trial. (*Scott* v. *Farrar* (1983) 139 Cal.App.3d 462 [188 Cal.Rptr. 823]; *Bank of*

*America, etc.* v. *Oil Well S. Co.* (1936) 12 Cal.App.2d 265 [55 P.2d 885]; *Cowan O. & R. Co.* v. *Miley P. Corp.* (1931) 112 Cal.App. Supp. 773 [295 P. 504]; see also *Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62] ["in passing upon a motion for summary judgment, the primary duty of the trial court is to decide whether there is an issue of fact to be tried. If it finds one, it is then powerless to proceed further, but must allow such issue to be tried by a jury . . . . By an unbroken line of decision in this state since the date of the original enactment of section 437c, the principle has become well established that issue finding rather than issue determination is the pivot upon which the summary judgment law turns."].)

By contrast, the case management order involved in the case at bar put the onus of proving the viability of the claim—on penalty of elimination of plaintiffs' personal injury causes of action—on the party seeking to litigate the claim at trial. This procedure constitutes impermissible burden shifting neither contemplated nor authorized by the legislative provisions for summary judgment. Additionally, and in direct conflict with the prescribed rules for summary judgment, the trial court strictly construed the proof of the claims offered by the parties opposing the motion. This procedure contradicts and conflicts with the methods specified for summary adjudication of issues as expressed by the legislative judgment in Code of Civil Procedure section 437c. Because this procedure cannot be reconciled with the legislative determination governing summary judgments, authorization of this case management order as within a trial court's inherent power or within its powers when handling complex cases must be rejected. (Code Civ. Proc., §§ 187, 128, subd. (a), 177; *Albermont Petroleum, Ltd.* v. *Cunningham, supra,* 186 Cal.App.2d 84, 93 [local rule inconsistent and in conflict with statutory provisions for summary judgment which deprived litigant of his statutory rights declared void and unenforceable].)

## II. *The Trial Court Applied a Test of Causation Which Was Not Appropriate for a Toxic Tort Case.*

The more fundamental reason for this dissent goes beyond the procedural problems with this case management order. Even assuming the procedure used was both lawful and constitutional, I differ with my colleagues about the proper standard of causation in a toxic tort case. It is true the expert witness declarations the plaintiffs proffered in this proceeding could have been more precise about degrees of probability and the like. Nonetheless, these experts addressed the proper test for causation in a toxics case and were sufficient to survive any legitimate summary judgment motion.

Several of plaintiffs' expert witnesses—toxicologists, neurologists, and the like—furnished declarations offering their opinions *to a reasonable*

*medical certainty* that: (1) Individual plaintiffs were and are suffering significant diseases and conditions;[1] (2) The chemical soup in this former dump contains a number of individual chemicals and other toxics in substantial amounts; (3) These toxics have been scientifically found *to increase the risk* those exposed will suffer the same types of diseases and conditions plaintiffs in fact were and are experiencing. That is, persons exposed to these toxics will suffer increased incidences of these diseases and conditions compared to those who are not so exposed. (Significantly, the experts also compared plaintiffs with the general population and found a consistent pattern of damage to the immune system. This renders plaintiffs less resistant to a wide range of serious and not-so-serious diseases now and into the future.)

It would have been preferable if these experts had quantified the *degree* of increased risk attributable to the different toxics or to the mix of toxics found in this former disposal site. But the trial court did not specify that precise issue or suggest this deficiency was what prompted its decision plaintiffs had ot tendered prima facie proof of causation. Instead what the trial court sought was an *impossibility* in this as in virtually all toxic tort cases— evidence a given toxic or combination of toxics was the *cause in fact* of a given disease or other condition in a specific individual. This is not a reasonable causation standard to apply in a toxics tort case such as the one before the court.

---

[1]Few of the plaintiffs have suffered or are suffering as yet from life-threatening diseases or conditions such as cancer. However, the diseases and conditions they have experienced are serious enough to represent "appreciable harm." Consequently, under present interpretations of California's statutes of limitations and the common law policy against splitting causes of action plaintiffs must sue now or be forever barred. (*Davies* v. *Krasna* (1975) 14 Cal.3d 502 [121 Cal.Rptr. 705, 535 P.2d 1161] [limitations period commences running when plaintiff discovers defendant's tortious act has caused "appreciable harm"].) If these plaintiffs were to wait until visited with a serious, life-threatening disease to pursue their personal injury causes of action the limitations period would have expired before they had a chance to file their lawsuits.

This construction of the law is open to criticism. It deprives plaintiffs of the chance to recover for serious harm which has a long latency period, especially if the same tortious act happens to cause immediate, less serious yet "appreciable" injuries. (*Martinez-Ferrer* v. *Richardson-Merrell, Inc.* (1980) 105 Cal.App.3d 316 [164 Cal.Rptr. 591] justified a narrow exception to the policy against splitting causes of action where the later developing disease is qualitatively different and unrelated to the "appreciable harm" which occurred shortly after the tortious act. Even this narrow exception has been criticized in subsequent opinions. See, e.g., *DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011, 1024 [242 Cal.Rptr. 368].)

The existing law likewise may add to the burdens on the courts. It compels plaintiffs to file at the first hint of "appreciable injury" if there is *any* possibility something truly serious might develop later on, even if most people would not sue for that initial injury. (*Miller* v. *Lakeside Village Condominium Assn.* (1991) 1 Cal.App.4th 1611 [2 Cal.Rptr.2d 796], conc. opn.)

Nevertheless, under present law plaintiffs were required to file their personal injury claims now. They are entitled to have the courts give those causes of action serious consideration whether or not they are based on life-threatening injuries or diseases.

With the exception of certain rare substances—asbestos is an example—toxics do not cause unique injuries or diseases. Instead they cause the same injuries and diseases as other factors in the environment can cause. Or they make humans more susceptible to these other factors.

Asbestos—and only asbestos—causes asbestosis. Thus when a plaintiff supplies evidence he is suffering from asbestosis it is possible for an expert to venture the opinion asbestos is the "cause in fact" of that specific individual's injury.[2] But scores or hundreds of different environmental factors can cause or contribute to most forms of cancer and other injuries and diseases typically confronted in toxic tort cases. Consequently, when a plaintiff is exposed to a toxic and subsequently suffers some disease or injury no expert honestly can testify the toxic caused that particular individual to experience that particular disease or injury.[3]

What science typically can tell us, on the other hand, is that people exposed to a certain toxic have a heightened *risk* of developing a certain disease or injury. To put it another way, a higher percentage of them will experience that disease or injury than those who are not exposed to the particular toxic.[4] But even when the plaintiff proves he has both been exposed to the toxic and later developed the disease or other injury, no expert can responsibly testify to a medical certainty the toxic is the cause in fact of the disease or injury. Only in the rare situation where exposure to a particular toxic raises the risk of the disease by over 50 percent can an

---

[2] Even some diseases formerly attributed exclusively to asbestos can be caused by other agents. "Researchers have recently associated even mesothelioma, which had been thought to be exclusively linked to asbestos exposure, with exposure to other sources." (Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System* (1984) (hereafter Rosenberg) 97 Harv. L.Rev. 851, 856, fn. 31, summarizing results reported in Stanton & Wrench, *Mechanisms of Mesothelioma Induction With Asbestos and Fibrous Glass* (1972) 48 J. Nat'l Cancer Inst. 797, 811-815.)

[3] "Rarely is any particular toxic agent the exclusive source of a given disease. Insidious diseases generally have several sources, each of which may by itself be sufficient to bring about the condition. . . . [G]iven current limits on our knowledge of the etiology of insidious diseases and given the generality of statistical data, it is impossible to pinpoint the actual source of the disease afflicting any specific member of the exposed population." (See Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, supra,* 97 Harv. L.Rev. 856-857.)

[4] "[I]n an individual case, epidemiology cannot conclusively prove causation; at best, it can establish only a certain *probability that a randomly selected case of disease was one that would not have occurred absent exposure, or the 'relative risk' of the exposed population.* Toxic tort litigation, therefore, involves inferences on causation derived from group-based information, rather than specific conclusions regarding causation in the individual case. . . . [¶] 'Relative risk' is simply the ratio of the incidence of disease in the exposed population to the incidence of disease in the non-exposed population." (See Gold, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence* (1986) 96 Yale L.J. 380 & fn. 17.) (Italics added.)

expert even testify it is more probable than not the toxic is the cause in fact of the disease or injury.[5]

Toxics thus pose a new problem for the law of torts. The old rules of causation simply don't work—because toxics are not automobiles or the other instruments of sudden destruction so familiar to the law. Toxics operate at a microscopic, often submicroscopic, level. They also typically do their damage over the course of months or years. Consequently, there are no witnesses to the "events" linking the toxic to its victim—no one to say "I saw this toxic invade this cell and chemically alter its composition so that a dozen cell generations later it mutated into a cancer that then grew larger and larger until it now threatens the plaintiff's life." Unless the toxic is one of those rare agents, like asbestos, which conveniently causes its own unique disease, there is no way for anyone to testify to the causal path that actually linked the toxic with its injurious effect in the particular case.[6]

As a result, what the trial court sought from plaintiffs' experts in this case—although the traditional causation standard for negligence cases—was not feasible or appropriate in a toxic tort case. The remaining question is whether the law is to deny recovery in the vast majority of toxic tort cases because it is not possible to satisfy a causation test developed in the context of and for the purpose of deciding an entirely different class of cases.

The costs of precluding recovery for personal injuries in all or virtually all toxic tort cases are unacceptable. First, it would deny compensation entirely to thousands of victims who would not be suffering illness or injury except for the fact someone introduced a toxic into their environment. The possibility others experienced the same diseases or injuries without being exposed to the toxic agent would not lessen the damage they have suffered. Nor would it be lessened by the fact still others were exposed to that same toxic without experiencing any ill effects. Those who would not have suffered injury but for the defendant's negligent production, distribution, or disposal of the toxic have a need and entitlement to compensation just like any other victim of any other tort.

---

[5]"Cigarette smoking presents a striking exception to the general rule that the excess risk created by an activity does not exceed the background risk. For example, the incidence of lung cancer among asbestos-exposed workers who smoke is 10 times greater than that among similarly exposed *workers who do not smoke.* See Selikoff & Hammond, *Asbestos and Smoking,* 242 J.A.M.A. 458, 458 (1979) (editorial)." (See Rosenberg, *supra,* at p. 858, fn. 40.)

[6]The possibility that in some cases a full scale autopsy might yield evidence identifying a given toxic as the probable cause of a victim's fatal disease provides slight comfort and no help to living plaintiffs.

There is a second problem with denying compensation in toxic tort cases where the traditional "cause in fact" standard cannot be satisfied. The toxic will not bear the economic cost of the harm it is causing. As a result, industry will lack this economic incentive to reduce production and use of the toxic in the future, or to take more care with its distribution and disposal. The price of the toxic will be artificially low and thus more of it will be consumed than would be the case if the price included the cost of compensating those the toxic injured. Industry also will have less economic incentive to develop and market nontoxic substances capable of performing the same function but possibly more expensive to produce.[7] Since industry will fail to make optimal investments in accident avoidance, the failure to compensate past toxic victims in the present guarantees there will be more toxic victims in the future.[8] So, there is a societal stake, not just an individual stake, in seeing toxics bear the full costs of the harms they cause.[9]

There is a danger of "overcompensation," however, if we give *full* compensation to every person exposed to a toxic who later develops a disease or injury the toxic is *capable* of causing. Assume chemical "X" increases the risk of cancer by 15 percent among people who are exposed to it. (This means if 1 percent of unexposed persons get this cancer, 1.15 percent of exposed persons will.) But of those exposed persons who fall victim to cancer the vast majority (over 85 percent) would have gotten cancer without that exposure. The problem is we don't know which cancer victims owe their disease (and possible death) to their exposure to this particular toxic chemical and which of them would have succumbed to this horrible plague in any event. If we were to require those responsible for exposing people to

---

[7]"[T]he social costs of producing and using carcinogenic substances are not accounted for in the production decisions of producers because the costs of the production's adverse impact on health are borne by cancer victims rather than carcinogen producers. In economic terms, production of carcinogens results in an externality, that is, a divergence between the private costs and the social costs of carcinogen production. (See Dahlman, *The Problem of Externality* 22 J.L. & Econ. 141, 141 (1979).) The presence of an externality reflects the existence of a market failure, in this case the improper pricing of the adverse effect on health and safety that is caused by production." (Note, *Tort Actions for Cancer: Deterrence, Compensation, and Environmental Carcinogenesis* (1981) 90 Yale L.J. 840, 843, fn 12.)

[8]See Rizzo & Arnold, *Causal Apportionment in the Law of Torts: An Economic Theory* (1980) 80 Colum. L.Rev. 1399.

[9]"Ironically, however, it is the wholesale character of mass exposure risks and the profit-making context in which they occur that should inspire a degree of optimism about the tort system's capacity to control mass accidents and redress their victims. For in contrast to sporadic accidents, which generally result from all-too-human individual lapses of attention, mass exposure torts are frequently products of the deliberate policies of business that tailor safety investments to profit margins. Such risk-taking policies should be especially amenable to control through threats of liability." (See Rosenberg, *supra*, at p. 855.)

chemical "X" to compensate 100 percent of the exposed persons for 100 percent of their losses (medical expenses, income loss, pain and suffering, etc.) we would be requiring toxic chemical "X" to bear more than its share of the financial burden that cancer imposes on the population—in this example almost eight times the burden the chemical's existence is responsible for.

It is not so much that this overcompensation would produce a form of windfall for most of the cancer patients who happened to have been exposed to chemical "X." (Some might question whether we should begrudge any cancer victims a "windfall" that might prolong their lives or ease their pain.) No, the more serious problem is the distorted incentives that would result. By requiring chemical "X" to *fully* compensate the hundreds or thousands who suffer cancers it did not cause, the law would be imposing unwarranted costs on this product. The market price would be higher than it should. Too little of chemical "X" would be produced and used. Costly alternatives would become economically viable and be substituted for "X," thus raising the price of products which formerly incorporated this chemical.[10] There might even be less economic incentive for cancer victims and researchers to look for other causes of this form of cancer. Since all victims would be entitled to *full* compensation from this single agent—even in cases where other factors actually caused the disease—there would be less motivation to attempt to identify other chemicals or environmental factors that can trigger the development of this cancer.

Fortunately, it is possible to avoid this apparent dilemma under California law by adopting a variant of "market share" liability. Instead of choosing between the extremes of overcompensation and no compensation at all, this solution allows plaintiffs to recover a *percentage* of their damages from those responsible for their exposure to the toxic. Under this formula defendants responsible for the toxic exposure are liable to all those who were exposed and later suffered injury—*including those who may have suffered the injury even if they had never come near the toxic substance.* But defendants are only liable for a percentage of plaintiffs' damages equal to the degree this exposure increased plaintiffs' risk of injury. For example, assume a chemical increases the risk of cancer by 15 percent among those exposed to the toxic. All exposed to this chemical who later came down with cancer would be

---

[10]See Shavell, *An Analysis of Causation and the Scope of Liability in the Law of Torts* (1980) 9 J. Legal Stud. 463, which notes that an otherwise successful firm or industry producing socially useful products might be forced to cease operations if it had to bear the financial burden of compensating persons whose disease actually was caused by other factors as well as those attributable to exposure to its product. See also Calabresi, *Optimal Deterrence and Accidents* (1975) 84 Yale L.J. 656.

entitled to recover 15 percent of their total damages from those responsible for the exposure.[11]

This solution sometimes is called "proportional liability."[12] In concept and effect, it is another application of the principle underlying "market share" liability.[13] Like its brother, already familiar to California law, "proportional liability" addresses the problem created when more than one factor causes a plaintiff's injury. Market share liability applies when the plaintiff is unable to prove a given defendant was the "cause in fact" of plaintiff's injury because several manufacturers produced and marketed the same injurious product. The law allows plaintiffs to recover a percentage of their damages from a defendant based on that defendant's share of the total number of products of this type which were sold. It is entirely possible a given plaintiff never used this particular defendant's product and another defendant's product actually caused all of plaintiff's injury. Nonetheless, the law allows the

---

[11]"[T]he proportionality rule is ideally suited to the task of resolving the problem of causal indeterminancy in mass exposure cases. Under a proportionality rule, the expected liability confronting firms equals the losses attributable to their tortious conduct." (See Rosenberg, *supra*, at p. 866.) See also Landes & Posner, *Causation in Tort Law: An Economic Approach* (1983) 12 J. Legal Stud. 109, 123-124.)

[12]"[T]he central component . . . is the replacement of the preponderance rule by a standard of proportional liability. Under such a standard, courts would impose liability and distribute compensation in proportion to the probability of causation assigned to the excess disease risk in the exposed population, regardless whether that probability fell above or below the fifty-percent threshold and despite the absence of individualized proof of the causal connection." (See Rosenberg, *supra*, at p. 859.) "[I]f the statistics show that only 40% of those with plaintiff's cancer developed the disease from exposure to hazardous waste, she may recover 40% of her damages without any danger of overdeterring the defendant." (Note, *Developments—Toxic Waste Litigation—Common Law Personal Injury Recovery* (1986) 99 Harv.L.Rev. 1602, 1621, fn. 104.)

[13]See *Sindell* v. *Abbott Laboratories* (1980) 26 Cal.3d 588, certiorari denied 449 U.S. 912 [66 L.Ed.2d 140, 101 S.Ct. 285]. Commentators have noted the close family relationship between market share liability and proportional liability.

"Analytically, . . . the two kinds of causal indeterminacy pose a single issue: how should tort law respond to cases in which a range of plausible alternate causes cannot conclusively be ruled out, and causations *must* be expressed probabilistically? . . . Generally, *there is no justification* for treating alternate *causes in different ways simply because they are or are not produced by named defendants.*" (Gold, *supra*, 96 Yale L.J. 376, 377, fn. 6, italics added.)

"Just as market share statistics generally suggest the causal responsibility of the defendants while failing to pinpoint any specific defendant responsible for a particular plaintiff's injuries, epidemiological studies suggest the causal responsibility of a hazardous substance while failing to separate those plaintiffs harmed by that substance from those harmed by the background risk of disease. . . . [¶] As the *Sindell* court recognized, a rational judicial response to probabilistic evidence that does not identify any one defendant or victim with particularity is to apportion the liability or recovery. Thus, if a study established an attributable risk of fifty percent, the court should allow each plaintiff to recover fifty percent of her full damages rather than deny her any recovery." (Note, *Developments—Toxic Waste Litigation—Common Law Personal Injury Recovery*, *supra*, 99 Harv.L.Rev. 1602, 1621. See also Note, *supra*, 90 Yale L.J. 840, 853.)

plaintiff to recover the appropriate market share percentage of his damages from any of the defendants who exposed him to the *risk* of injury by selling that product in the market place. Similarly, the "proportional liability" rule allows injured plaintiffs to recover an appropriate percentage of their damages from those who increased their *risk* of injury by exposing them to toxics capable of causing that injury.

If tort law is to perform its dual functions of compensating injured parties and encouraging optimal safety investments in the context of toxic torts, it cannot use the causation test the majority opinion asks trial courts to apply in these cases. Consistent with the general principle established in the market share cases the appropriate test would allow recovery proportional to the defendant's contribution to plaintiffs' increased risk of incurring the injuries they suffered. "Under a theory of proportional recovery, the usual requirement that a plaintiff prove that the defendant more likely than not caused her injury is unnecessary. That rule was intended solely to prevent overdeterrence when a plaintiff could recover only all or none of her damages."[14]

It is not altogether clear plaintiffs would have been able to tender evidence which could satisfy such a test.[15] But at least they should be given the chance to do so. Moreover, for reasons expressed earlier in this dissent they

---

[14]Note, *Developments—Toxic Waste Litigation—Common Law Personal Injury Recovery*, *supra*, 99 Harv.L.Rev. 1602, 1621, footnote 104.

[15]The majority opinion implies the dissent is discussing a brand new cause of action granting damages to plaintiffs for the increased *risk* of injury they experience because defendants have exposed them to toxics. While it is true some commentators have proposed just such a cause of action, that is not what I am describing in this dissent. The proposed new cause of action the majority mentions would compensate not for the plaintiff's actual personal injuries but for the increased *risk* the plaintiff will suffer such injuries in the future.

What I discuss in this dissent, on the other hand, is the appropriate causation standard to be applied in a regular personal injury action arising out of exposure to toxics. Under this approach to causation the plaintiffs are only compensated for their actual personal injuries rather than the risk of future injuries. However, they receive such compensation without proving the toxic exposure rather than some other possible factor caused those actual injuries. The level of risk is part of the equation because it measures the amount of compensation plaintiffs receive not because it is the loss being compensated. The compensation plaintiffs receive for their actual injuries is reduced to match the probability (i.e., risk) these injuries were caused by the toxic exposure instead of some background factor.

What this means, of course, is that the petitioners' existing complaint already alleges the cause of action I am discussing in this dissent—a regular, straightforward personal injury claim. Consequently neither the Legislature nor the Supreme Court has to come up with an exotic new cause of action in order to implement the views expressed in this dissent. All that is required is that California courts apply to toxic torts the approach to causation the Supreme Court has already adopted in *Sindell*.

should be offered that opportunity in a legitimate, full-blown summary judgment motion and not as part of a case management order.